USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 3/4/11

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

MR. JEREMY LEVIN and DR. LUCILLE LEVIN,

09 CV 5900 (RPP)

Plaintiffs

- against -

BANK OF NEW YORK, JP MORGAN CHASE, SOCIÉTÉ GÉNÉRALE and CITIBANK,

**OPINION AND AMENDED ORDER**

Defendants.

---------------------------------------------------------------X

BANK OF NEW YORK MELLON, JP MORGAN CHASE, SOCIÉTÉ GÉNÉRALE and CITIBANK,

Third-Party Plaintiffs

- against -

STEVEN M. GREENBAUM, et al.

Third-Party Defendants.

---------------------------------------------------------------X

--------------------------------------------------------------X

BANK OF NEW YORK, JP MORGAN CHASE, SOCIÉTÉ GÉNÉRALE and CITIBANK,

Third-Party Plaintiffs

- against -

ESTATE OF MICHAEL HEISER, et al.,

Third-Party Defendants.

--------------------------------------------------------------X

**ROBERT P. PATTERSON, JR., U.S.D.J.**

Plaintiffs Jeremy and Dr. Lucille Levin move for partial summary judgment and a turnover order as to certain accounts blocked pursuant to regulations issued by the Office of Froeign Asset Control or the United States Department of Treasury (the "Phase One Assets") held by several banks: Bank of New York Mellon ("Bank of New York"), Société Générale, Citibank, N.A. ("Citibank"), and JP Morgan Chase Bank, N.A. ("JP Morgan") (collectively, the "New York Banks"). Plaintiffs also seek summary judgment as to certain third party defendant Iranian Judgment Creditors, namely the Heiser Creditors and the Greenbaum and Acosta Creditors, designating the Plaintiffs as the holders of a first priority lien interest in the Phase One Assets. The Heiser Creditors cross move for summary judgment designating the Heisers as the holders of a first priority lien interest in three blocked wire transfers held at the Bank of New York. The Greenbaum and Acosta Creditors similarly cross-move for summary judgment

designating them as the holders of a first priority lien interest in assets held by JP Morgan and Citibank.

**BACKGROUND**

Plaintiff Jeremy Levin was the CNN bureau chief in Lebanon during a period when the Islamic Republic of Iran ("Iran") was using the organization Hizbollah directly and indirectly to commit terrorist acts against American civilians. (Plaintiffs' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Pls.' 56.1 Statement") at ¶ 1.)[1] Mr. Levin was taken hostage and tortured during 1983-84, when he was held by Hizbollah in a house directly across from the Iranian Revolutionary Guard headquarters in the Bekka Valley of Lebanon. (Pls.' 56.1 Statement at ¶ 2.) After his escape from his captors, Mr. Levin returned to the United States. (Id. at ¶ 3.) The effects of Mr. Levin's torture and imprisonment caused severe and ongoing harm to both Mr. Levin and his wife Dr. Levin. (Id.)

On February 6, 2008, following a trial, the United States District Court for the District of Columbia entered judgment in favor of the Levins, and against the Islamic Republic of Iran, the Iranian Ministry on Information and Security, and the Iranian Islamic Revolutionary Guard Corp (collectively, the "Iranian Judgment Debtors"). (Id. at ¶ 4.) See Levin v. The Islamic Republic of Iran, 529 F.Supp. 2d 1 (D. D.C. 2007). The judgment awards the Levins $28,807,719. (Id.) Upon receiving this award, the Levins served information subpoenas on the Office of Foreign Asset Control ("OFAC"), which produced government records identifying certain assets in which Iran or its instrumentalities have an interest, and that were accordingly blocked by OFAC from January 1, 2007 to June 30, 2008 ("Blocked Assets"). (Id. at ¶ 5.) OFAC responded via a

[1] Unless otherwise noted, citations to the parties Statements of Undisputed Facts are admitted by all opposing parties.

letter to Plaintiffs dated October 6, 2008, which disclosed information regarding certain Iranian assets held in the United States pursuant to various blocking regulations. (Declaration of Suzelle Smith, ("Smith Decl.") Ex. 2.) The Levins then proceeded to serve additional information subpoenas on the New York Banks, and in response, further identifying information related to OFAC Blocked Assets was disclosed from the New York Banks' business records. (Pls.' 56.1 Statement at 5.)

On April 20, 2009, the Levins registered their judgment with the United States District Court for the Southern District of New York, and on October 14, 2009, the Levins served their judgment on the Iranian Judgment Debtors through court and diplomatic channels. (Id. at ¶¶ 6-7.) On June 19, 2009, the Levins delivered Writs of Execution, issued by the Clerk of this Court. to the United States Marshal for the Southern District of New York for service on the New York Banks. (Id. at ¶ 8.) The Marshal served the New York Banks with the Writs. (Id.) On June 26, 2009, the Levins filed their complaint in this Court. (Id. at ¶ 9.)

On January 11, 2010, this Court entered an Order authorizing Third-Party Interpleader Complaints and divided the proceeding into two phases. In Phase One, the Court would determine the right of Plaintiffs to execute and collect certain assets selected by Plaintiffs (the Phase One Assets). (Smith Decl., Ex. 12.) Phase Two would involve other assets within the scope of the Complaint. On February 1, 2010, Defendants Bank of New York, JP Morgan, Société Générale and Citibank filed an Interpleader Complaint pursuant to Rule 22 of the Federal Rules of Civil Procedure against a number of parties that held judgments against the Iranian Judgment Debtors, as well as commercial entities with connections to the blocked assets, in order to determine whether any of these parties had priority interests to the assets sought by the Levins. (See Interpleader Complaint, February 1, 2010, ECF No. 60.) The Greenbaum and Acosta

Judgment Creditors were served with the Interpleader Complaint on February 19, 2010. (Pls.' Rule 56.1 Statement at ¶ 19.) The Heiser Judgment Creditors were served with the Interpleader Complaint on June 1, 2010. (Id.)

      The Greenbaum Judgment Creditors hold a judgment issued by the U.S. District Court for the District of Columbia for $19,878,023.00 against the Islamic Republic of Iran and the Iranian Ministry of Information and Security ("MOIS"). (The Greenbaum and Acosta Judgment Creditors' Counterstatement of Undisputed Facts Pursuant to Local Rule 56.1 ("Greenbaum/Acosta 56.1 Counterstatement") at ¶ 68; Declaration of James L. Bernard, Ex. 3.) This judgment was awarded on August 10, 2006 in satisfaction of a suit brought by the Greenbaum Judgment Creditors under 28 U.S.C. § 1605(a)(7) against Iran and the MOIS for damages the Greenbaum Judgment Creditors suffered in conjunction with the death of a woman killed in an August 9, 2001 terrorist attack on a restaurant in Jerusalem, Israel. (Greenbaum/Acosta 56.1 Counterstatement at ¶¶ 66-67.) The Greenbaum Judgment Creditors served Iran and MOIS with their judgment on April 22, 2007 through court and diplomatic channels. (Id. at ¶ 69.) On December 10, 2008, the Greenbaum Judgment Creditors registered their judgment in the Southern District of New York. (Id. at ¶ 70.) On December 14, 2009, the Greenbaum Judgment Creditors obtained an order from this court (Jones, J.) pursuant to 28 U.S.C. § 1610(c) permitting them to obtain a writ of execution to levy against property of Iran held by Citibank in this District. (Id. at ¶ 71.) On December 21, 2009, the Greenbaum Judgment Creditors obtained the writ of execution from the Clerk of the Court and delivered it to the U.S. Marshal for the Southern District of New York. (Id. at ¶ 72.) On April 5, 2010, the Greenbaum Judgment Creditors obtained an amended writ of execution from the Clerk of Court and delivered it to the U.S. Marshal for the Southern District of New York on April 6, 2010. (Id. at ¶

73.) The U.S. Marshal levied by service of the amended execution upon Citibank on April 15, 2010. (Id.) On April 15, 2010, the Greenbaum Judgment Creditors filed their Answer to the Third Party Complaint and Counterclaims in response to the interpleader complaint. (Id. at ¶ 74.)

On August 26, 2008, the Acosta Judgment Creditors obtained a judgment in the U.S. District Court for the District of Columbia against the Islamic Republic of Iran and the MOIS in the amount of $350,172,000. (Id. at ¶ 77.) This judgment was awarded in satisfaction of a lawsuit filed by the Acosta Judgment Creditors against Iran and the Ministry under 28 U.S.C. § 1605A to compensate the Acosta Judgment Creditors for damages suffered from the assassination of Rabbi Meier Kahane and the shooting of Irving Franklin and U.S. Postal Officer Carlos Acosta on November 5, 1990. (Id. at ¶¶ 75-76.) On September 28, 2009, the Acosta Judgment Creditors served Iran and the MOIS with their judgment through court and diplomatic channels. (Id. at ¶ 78.) The Acosta Judgment Creditors registered their judgment in the Southern District of New York on December 1, 2008, and on December 14, 2009, obtained an order from the this Court (Jones, J.), pursuant to 28 U.S.C. § 1610(c) permitting them to obtain writs of execution to levy against property of Iran held by Citibank and JP Morgan Chase in this District. (Id. at ¶ 80.) On December 21, 2009, the Acosta Judgment Creditors obtained Writs of Execution from the Clerk of the Court and delivered them to the U.S. Marshal. (Id. at ¶ 81.) On April 5, 2010, the Acosta Judgment Creditors obtained amended Writs of Execution from the Clerk of Court and delivered them to the U.S. Marshal for the Southern District of New York on April 6, 2010. (Id. at ¶ 82.) The U.S. Marshal levied by service of the amended writs on April 15, 2010. (Id.) On April 15, 2010, the Acosta Judgment Creditors filed their Answer to the

Third-Party Complaint and Counterclaims in response to the New York Banks' interpleader complaint. (Id. at ¶ 83.)

On September 29, 2000 and October 9, 2001, two groups of plaintiffs filed claims in the United States District Court for the District of Columbia against Iran, the Ministry of Information and Security and the Iranian Revolutionary Guard. (The Heiser Judgment Creditors' Statement of Undisputed Facts Pursuant to Local Rule 56.1 ("Heiser 56.1 Statement") at ¶¶ 3-4.) These suits sought compensation for damages suffered in conjunction with the June 25, 1996 bombing of the Khobar Towers complex in Saudi Arabia. (Heiser 56.1 Statement at ¶¶ 1-2.) On February 1, 2002, the two actions were consolidated, and on December 22, 2006, the Heiser Judgment Creditors obtained a judgment pursuant to 28 U.S.C. § 1605(a)(7) in the amount of $254,431,903 against Iran, the MOIS, and the Iranian Revolutionary Guard. (Id. at ¶¶ 5-6.) On February 7, 2008, the D.C. District Court issued an order pursuant to 28 U.S.C. § 1610(c) permitting the Heiser Judgment Creditors to pursue attachment in aid of execution of the December 2006 judgment. (Id. at ¶ 7.) On January 13, 2009, the D.C. District Court converted the Heiser Judgment Creditors' December 2006 judgment issued under 28 U.S.C. § 1605(a)(7) into a judgment pursuant to 28 U.S.C. §1605A. (Id. at ¶ 8.) On August 27, 2008, the Heiser Judgment Creditors registered the Judgment with the U.S. District Court for the District of Maryland. (Id. at ¶ 11.) On April 27, 2010, the Heiser Judgment Creditors filed a Request for Writ to the Bank of New York in the Maryland District Court. (Id. at ¶ 11-12.) This writ was issued on April 30, 2010, and served on the Bank of New York in Maryland on May 3, 2010. (Id. at ¶¶ 12-13.)

In addition to the Heisers and the Greenbaums and Acostas, there remain eight other judgment creditor groups that were interpled as third-party defendants. Of these, only 4 have

asserted any interest in the Phase One Assets: the Brown, Blan, Silvia and Rubin judgment creditors. (Pls.'s 56.1 Statement at ¶ 22-23; Smith Decl., Exs. 41-43.) With the exception of the Rubin judgment creditors, none of the other groups have attached or executed against any of the Phase One Assets. (Smith Decl., Ex. 58.) The Rubin judgment creditors have not obtained an order of the court pursuant to 28 U.S.C. § 1610(c) authorizing execution, nor have they moved for a turnover order. (Smith Decl., Ex. 41.)

The New York Banks also filed an interpleader complaint against commercial entities that might have an interest in the Blocked Assets by virtue of their connections to the blocked wire transfers or accounts. See Order, January 11, 2010, Docket No. #33. Commerzbank is the only commercial third-party defendant to have made a claim to any of the Phase One Assets. (Smith Decl., Ex. 50). However, Commerzbank's claim was withdrawn, and the interpleader complaint dismissed as to Commerzbank by Stipulation and Order of this Court dated July 26, 2010. Therefore, the only parties seeking the Phase One Assets who have attached or executed against them and moved for turnover are the Levin, Heiser, and Greenbaum and Acosta Judgment Creditors.

On July 13, 2010, the Levin Plaintiffs filed a Motion for Summary Judgment that Plaintiffs possess a priority interest in the Phase One Assets and seeking a Turnover Order directing the New York Banks to turn over the specified Phase One Assets. On September 13, 2010, the Heiser Judgment Creditors filed a Cross-Motion for Summary Judgment that the Heisers possess a priority interest in the Phase One Blocked Assets held by Bank of New York, and a Turnover Order directing the Bank of New York to release the Phase One Blocked Assets, as well as a brief in opposition to the Levins' motion. Also on September 13, 2010, the Greenbaum and Acosta Judgment Creditors filed a Cross-Motion for Summary Judgment that

they possess a priority interest in the Phase One Blocked Assets held by Citibank and JP Morgan, and moved for a Turnover Order directing those banks to release the Phase One Blocked Asssets, as well as a brief in opposition to the Levins' motion. On September 15, 2010, Citibank and JP Morgan Chase filed a joint brief identified as a "Response" to the Plaintiffs' Motion for Summary Judgment. On September 24, 2010, the Levins filed briefs in opposition to the Heiser and the Greenbaum and Acosta motions, and a reply in support of their original Motion for Summary Judgment. On September 29, 2010, oral argument was held before this Court. On October 6, 2010, the Heiser Judgment Creditors filed a supplemental brief addressing the validity of their writ issued by the District Court in Maryland. On October 26, 2010, the Bank of New York Mellon filed a supplemental brief regarding the validity of the Heiser Judgment Creditors' Maryland writ.

For the reasons stated below, the Levins' and the Heisers' Motions for Partial Summary Judgment are denied, and the Greenbaum and Acosta Third-Party Defendants' Motion for Summary Judgment and a Turnover Order is granted.

## DISCUSSION

### I. Summary Judgment Standard

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). It is the initial burden of a movant on summary judgment to demonstrate that there is no genuine issue of material fact. F.D.I.C. v. Great American Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010). When the moving party has met this initial burden, the

opposing party must set forth specific facts showing that there is a genuine issue for trial, and cannot rest on mere allegations or denials of the facts asserted by the movant. Davis v. State of New York, 316 F.3d 93, 100 (2d Cir. 2002). The Court must "view the evidence in the light most favorable to the non-moving party, and may grant summary judgment only when no reasonable trier of fact could find in favor of the non-moving party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995).

Plaintiffs Jeremy and Dr. Lucille Levin move for partial summary judgment and a turnover order as to Blocked Assets held at Bank of New York, Société Générale, Citibank and JP Morgan and partial summary judgment as to third party defendant Iranian Judgment Creditors, including the Heisers and the Greenbaums and Acostas. The Levins assert that because they have fulfilled the requirements of New York's collection statutes, and are the first party to have served writs of execution on the New York Banks to obtain the Blocked Assets, they have priority over the other Iranian Judgment Creditors. The Levins also contend that they are entitled to a turnover order, because the Blocked Assets in question are subject to execution and include accounts and wire transfers that originate from Iran or its agencies or instrumentalities or were sent for the benefit of Iran or its agencies or instrumentalities.

The Heiser Judgment Creditors ("The Heisers") oppose the Levins' motion because the Levins failed to obtain an order pursuant to 28 U.S.C. § 1610(c) authorizing them to pursue attachment and execution of the blocked assets, and therefore, the Heisers assert, the Levins writs are void. The Heisers cross-move for summary judgment on the grounds that they hold an unsatisfied judgment against Iran and have executed on the assets held by Bank of New York properly, by obtaining a court order under 28 U.S.C. § 1610(c) prior to obtaining a writ. The Heisers accordingly claim that they hold a first priority lien interest in three blocked wire

transfers at Bank of New York. The Levins oppose the Heisers' Motion for Summary Judgment and claim that the Heisers' writ of execution is invalid as to the Bank of New York wire transfers because it was issued by a Maryland District Court and served on the Bank of New York in Maryland.

The Greenbaums and Acostas oppose the Levins' motion on the same primary basis asserted by the Heisers, namely that the Levins' writs are void because the Levins failed to obtain an order pursuant to section 1610(c) prior to serving the writs. The Greenbaums and Acostas also move for summary judgment and a turnover order in their favor on the grounds that their writs are valid because they complied with section 1610(c), and that they therefore have priority to the Phase One Assets held at Citibank and JP Morgan. The Levins oppose the Greenbaum and Acosta motion by asserting that they were not required to obtain an order under 1610(c) in order to execute on the assets held by the New York Banks. They further contend that this Court should use its powers to find, *nunc pro tunc*, that the Levins' writs were in compliance with section 1610(c) at the time they were delivered.

In response to the Levins' motion, Defendants and Third-Party Plaintiffs Citibank and JP Morgan submitted a brief addressing whether the blocked assets sought by the parties are in fact subject to execution. The Heisers and Third Party Plaintiff Bank of New York submitted briefs addressing the validity of the Heiser Writs, which were issued and served in Maryland.

Resolution of these competing claims implicates two issues; the priority of interest among the parties to the Phase One Assets and the susceptibility of the Phase One Assets to attachment. Because the Judgment Creditors seek to attach different assets, this opinion will first address which of the parties holds a priority interest in which of the Phase One Assets. Then, the opinion will address whether those assets are susceptible to attachment.

II. Priority of Interest

The Court must first determine whether the Levin Plaintiffs hold a priority interest in the Blocked Assets held at the New York Banks that entitles them to turnover, or whether their failure to obtain an order of the court pursuant to 28 U.S.C. § 1610(c) renders their writs void as a matter of law.

The Foreign Sovereign Immunities Act, 28 U.S.C. § 1602 *et seq.*, ("FSIA") provides the exclusive basis for subject matter jurisdiction over all civil actions against foreign state defendants, and governs the immunity of a foreign state in United States Courts. Saudi Arabia v. Nelson, 507 U.S. 349, 351 (1993); Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 47 (2d Cir. 2010). The FSIA provides that "where a valid judgment has been entered against a foreign sovereign, property of that foreign state is immune from attachment and execution except as provided in the subsequent sections, sections 1610 and 1611. 28 U.S.C. § 1609." Weinstein, 609 F.3d at 48. One exception to foreign sovereign immunity applies where the property to be attached and executed is sought as compensation for personal injury or death resulting from an act of terrorism or the provision of material support or resources for an act of terrorism. 28 U.S.C. § 1605A. In such cases, property belonging to a foreign state, or to an agency or instrumentality of such state, is not immune from attachment in the aid of execution, or from execution, upon a judgment entered by a court of the United States. 28 U.S.C. § 1610(a). 28 U.S.C. § 1610(b). Moreover, the Terrorism Risk Insurance Act ("TRIA"), codified as a note to section 1610 of the Foreign Sovereign Immunities Act, explains that:

> In every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7)[2] of title 28, United States Code, the blocked

[2] Repealed and replaced with 28 U.S.C. § 1605A.

> assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201 (codified at 28 U.S.C. § 1610, note.)

While sections 1610(a) and (b) enumerate the exceptions to foreign sovereign immunity, section 1610(c) of the FSIA describes the procedure to be followed by plaintiffs seeking to execute or attach the property of a foreign sovereign or an agency or instrumentality of a foreign sovereign:

> No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

28 U.S.C. § 1610(c).

The order referred to in 1610(c) has been found to be mandatory by a number of courts reviewing attachments of the assets of foreign sovereigns. See First City, Texas Houston, N.A. v. Rafidain Bank, 197 F.R.D. 250, 256 (S.D.N.Y. 2000); Ferrostaal Metals Corp. v. S.S. Lash Pacifico, 652 F.Supp. 420, 423 (S.D.N.Y 1987); Gadsby & Hannah v. Socialist Republic of Romania, 698 F.Supp. 483, 485 (S.D.N.Y. 1988). According to a House Report on the FSIA, the procedures mandated by 1610(c) are in place to ensure that sufficient protection is afforded to foreign states that might be defendants in actions in United States Courts:

> In some jurisdictions in the United States, attachment and execution to satisfy a judgment may be had simply by applying to a clerk or a local sheriff. This would not afford sufficient protection to a foreign state. This subsection contemplates that the courts will exercise their discretion in permitting execution. Prior to ordering attachment and execution, the court must determine that a reasonable period of time has elapsed following the entry of judgment... In determining whether the period has been reasonable, the courts should take into account procedures, including legislation, that may be necessary for payment of a

> judgment by a foreign state, which may take several months; representations by the foreign state of steps being taken to satisfy the judgment; or any steps being taken to satisfy the judgment; or evidence that the foreign state is about to remove assets from the jurisdiction to frustrate satisfaction of the judgment.

H.R. Rep. No. 1487, 94th Cong., 2d Sess. 30, *reprinted in* 1976 U.S. Code Cong. & Admin. News 6604, 6629.

The Greenbaum and Acosta Judgment Creditors and the Heiser Judgment Creditors both contend that the Levins' writs of execution served on the New York Banks are invalid because the Levins failed to comply with section 1610(c) of the FSIA. The Levins concede that they did not obtain an order of the court pursuant to 1610(c) prior to serving their writs of execution. (Pls.' Mem. in Reply to the Greenbaum and Acosta Mem. in Opp. at 7 n.7; "It is undisputed that the Levins did not obtain a specific court order under § 1610(c) before seeking writs of execution issued by the court.") The Levins contend, however, that they were not required to obtain an order under section 1610(c), first because their judgment was issued pursuant to section 1605(a)(7), and not section 1605A, and therefore sections 1610(a), (b), and (c) do not apply to them. The Levins also contend that they were not required to obtain an order under section 1610(c) because they are pursuing Blocked Assets, the attachment of which, Plaintiffs claim, is governed by section 1610(f)(1)(A), not 1610(c). Further, the Levins argue that they may execute under TRIA, and that such executions are similarly not subject to the requirements of section 1610(c). Finally, the Levins contend that even if they were required to obtain a court order prior to obtaining and serving their writs of execution, this Court should find, nunc pro tunc, that the Levins' writs were in compliance with 1610(c) at the time of their delivery.

A. Section 1605(a)(7) and Section 1605A

The Levins hold a judgment issued pursuant to 28 U.S.C. 1605(a)(7), which was repealed in 2008 and replaced by 28 U.S.C. 1605A. See Pub. L. 110-181, Div. A, §1083 "Terrorism Exception to Immunity." 28 U.S.C. §§ 1610(a) and (b) enumerate the exceptions to foreign sovereign immunity from attachment and execution. The presently enacted sections 1610(a) and (b) list actions brought under 1605A, actions brought for damages resulting from terrorism, as one of the exceptions to foreign sovereign immunity. Prior to the enactment of section 1605A, sections 1610(a) and (b) listed actions brought under 1605(a)(7), the predecessor statute replaced by 1605A, as an exception to foreign sovereign immunity. In both the pre-2008 and the presently enacted versions of sections 1610(a) and (b), the exception for acts of terrorism appears listed at section 1610(a)(7) and section 1610(b)(3). Thus, section 1605A directly replaced section 1605(a)(7) in the statutory scheme governing exceptions to foreign sovereign immunity.

There are distinctions between actions brought under section 1605A and those brought under 1605(a)(7). "For instance, [§ 1605A] precludes a foreign state from filing an interlocutory appeal under the "collateral order" doctrine, § 1605A(f), and permits a plaintiff to attach property in advance of judgment, § 1605A(g). In addition, § 1605A(c) abrogates Cicippio-Puleo v. Islamic Republic of Iran, 353 F.3d 1024 (D.C. Cir. 2004), by creating a federal right of action against foreign states, for which punitive damages may be awarded." Simon v. Republic of Iraq, 529 F.3d 1187, 1190 (D.C. Cir. 2008) (reversed on alternative grounds, Republic of Iran v. Beatty, 129 S. Ct. 2183).

The Levins claim that because their judgment was entered pursuant to section 1605(a)(7), and not 1605A, they were not required to obtain an court order prior to executing the Blocked Assets held by the New York Banks. This argument fails. Section 1605(a)(7) was repealed and

replaced by section 1605A in 2008. Prior to 2008, section 1610 explicitly required plaintiffs proceeding under section 1605(a)(7) to obtain a court order prior to executing foreign assets. 28 U.S.C. 1610(a)(7); 28 U.S.C. 1610(b)(2) (2007). When section 1605(a)(7) was repealed and replaced by section 1605A, Congress updated section 1610 to incorporate section 1605A in the place of 1605(a)(7). There is no indication that this was done for any purpose other than to update the statute. Plaintiffs' argument asserts that while Congress intended that plaintiffs holding judgments pursuant to section 1605(a)(7) obtain court orders prior to the repeal of the statute, upon replacing 1605(a)(7) with 1605A, Congress decided to relieve 1605(a)(7) judgment holders of this requirement, but still impose it on terrorist victims pursuing judgments under 1605A. This argument defies logic, and accordingly fails. While plaintiffs holding 1605(a)(7) judgments do not need to convert them to 1605A judgments, such plaintiffs must still obtain court orders under 1610(c) prior to attachment or execution. Congress's interest in affording adequate protection to foreign sovereigns by imposing the requirement of a court order is of identical importance regardless of whether a plaintiff holds a claim under 1605(a)(7) or 1605A.

B. Section 1610(f)(1)(A)

The Levins next contend that the procedure described in section 1610(c) does not apply to their execution because they seek to recover blocked assets. They claim that the attachment and execution of blocked assets is governed by section 1610(f)(1)(A), and not section 1610(c).

Section 1610(f)(1)(A) provides:

> Notwithstanding any other provision of law...any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 App. U.S.C. 5 (b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370 (a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701-1702), or any other proclamation, order, regulation or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to

> a claim for which a foreign state (including any agency or instrumentality of such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or section 1605A.

28 U.S.C. § 1610(f)(1)(A).

When interpreting a statute, the "statute should be construed so that effect is given to all of its provisions, so that no part will be inoperative or superfluous, void or insignificant." Corley v. United States, 129 S. Ct. 1558, 1566 (2009). The Levins contend that section 1610(f)(1)(A) permits them to escape the requirements of 1610(c) despite the fact that their 1605(a)(7) claim was specifically subjected to 1610(c)'s requirements in the pre-2008 statutory language. Reading section 1610(f)(1)(A) in the light of the other subsections of section 1610, as the Court is required to do, establishes that the Levins remain subject to the requirement of section 1610(c), despite the fact that they seek to attach blocked assets. 1610(c) states that "no attachment or execution referred to in sections (a) or (b) of this section shall be permitted until after the court has ordered such attachment and execution..." As discussed above, sections 1610(a) and 1610(b) did, in fact, refer to attachments or executions pursuant to section 1605(a)(7) prior to the repeal of section 1605(a)(7). Section 1610(f)(1)(A) merely establishes that assets blocked pursuant to regulatory prohibitions on financial transactions are available for execution of any judgment brought under section 1605(a)(7) or 1605A. The fact that section 1610(f)(1)A) refers to 1605(a)(7) and 1605A indicates that 1610(f)(1)(A) is not itself a stand-alone exception to sovereign immunity, but rather a section targeting the process of executing on assets owned by foreign governments. Section 1610(f)(1)(A) in no way expressly overrides or eliminates the procedural requirements of section 1610(c), and therefore should not be interpreted to do so. Section 1610(f)(1)(A) explains that plaintiffs with claims under 1605(a)(7) or 1605A can

proceed to attach or execute blocked assets, as well as other assets held by a sovereign or an agency or instrumentality of a sovereign, provided that they fulfill the requirements of section 1610(c). Thus, Plaintiffs' second argument fails.[3]

C. TRIA

The Levins further contend that section 1610(c) does not apply to them because they are seeking a turnover of blocked assets under TRIA, which is not listed in section 1610(a) or (b) and therefore is not subject to the requirements of 1610(c). This argument fails for the same reason as Plaintiffs' foregoing argument regarding 1610(f)(1)(A). TRIA is codified as a note to section 1610, and must be read in the context of the overarching statutory scheme of the FSIA. Padilla v. Rumsfeld, 352 F.3d 695, 721 (2d Cir.2003) ("No accepted canon of statutory interpretation permits 'placement' to trump text, especially where, as here, the text is clear and our reading of it is fully supported by the legislative history.") To reiterate, section 1610(c), in both its present and pre-2008 incarnations, clearly states that "*no* execution or attachment *referred to* in subsections (a) and (b) of this section shall be permitted" without a court order. 28 U.S.C. § 1610(c) (emphasis added). TRIA does not invalidate or override section 1610(c), and does not erase the reference to section 1605(a)(7) in the pre-2008 versions of 1610(a) and (b) or the reference to 1605A in the updated version of the statute. There is no indication in the text of TRIA or 1610 that TRIA was intended to eliminate 1610(c)'s court order requirement in the

[3] At oral argument, the Heisers and the Acostas and Greenbaums asserted that section 1610(f)(1)(A) had been waived by President Clinton, and was therefore inapplicable. Tr. of Oral Argument, September 29, 2010 at 32:23-35:24; 46:20-47:16. The Levins contended that TRIA, at §201(b), imposed a requirement on Presidential waivers of exceptions to immunity from attachment or execution that the President waive exceptions to immunity on an asset by asset basis, and that therefore section 1610(f)(1)(A) is not subject to a blanket waiver. It does appear from a reading of TRIA that the President is now required to issue waivers on an asset by asset basis, and such waivers have not been issued with regard to the assets in question here. However, even if section 1610(f)(1)(A) applies with full force, it does not excuse the Levins from compliance with section 1610(c), as discussed herein.

context of terrorist assets, and no evidence that Congress intended for TRIA to trump section 1610. While the Levins are pursuing attachment under TRIA, their judgment against Iran was obtained via the exception to sovereign immunity found at 1605(a)(7), not in TRIA. Therefore, they remain subject to the requirements of 1610(c), and, since they are not in compliance, their writs are invalid.

D. Nunc Pro Tunc

Finally, the Levins urge the Court to find, nunc pro tunc, that the Levins' Writs were in compliance with 1610(c) at the time of their delivery to the U.S. Marshal on June 19, 2010.

"A nunc pro tunc order is granted only in extreme cases, when 'a court has spent an undue amount of time deliberating and thereby has caused the parties prejudice or harm.'" Hegna v. Islamic Republic of Iran, 380 F.3d 1000, 1008 (7th Cir. 2004) (citing Transamerica Ins. Co. v. South, 975 F.2d 321, 326 at n.2 (7th Cir.1992)). The purpose of a nunc pro tunc order is to correct the record, not to alter substantive rights. Id. Nunc pro tunc orders are a form of equitable relief, Zhang v. Holder, 617 F.3d 650, 652 (2d Cir. 2010), and as such, this Court concerns itself with fairness in determining whether such an order is warranted. SEC v. Management Dynamics, Inc., 515 F.2d 801, 808 (2d Cir. 1975) (explaining that considerations of fairness are the traditional concern of equity courts.)

This Court declines to find nunc pro tunc that the Levins' writs were in compliance with 1610(c) at the time of their delivery to the U.S. Marshal. The priority of interests among the Levins, the Greenbausm and Acostas and the Heisers is disputed, and in light of the competing interests, it would be inequitable to award a nunc pro tunc order and thereby entitle the Levins to recovery of the assets when they failed to comply with the statutory mandate of section 1610(c).

The Levins' writs of execution were served on the New York Banks without previously obtaining a court order permitting such execution as is required under 28 U.S.C. § 1610(c). The Levins' writs are therefore invalid, and any writs served by them without such an order cannot establish their priority of interest over any party that has served a valid, court-ordered writ and thereby executed or attached the Blocked Assets.

E. Validity of the Heisers' Maryland Issued Writ

Having found the Levins' writs to be invalid, the Court will next consider the Heiser Judgment Creditors' writs, the validity of which remains in doubt because they were issued by the United States District Court for the District of Maryland and served on the Bank of New York in Maryland.

The Heisers obtained a default judgment on December 22, 2006, in the amount of $254,431,903 in the United States District Court for the District of Columbia. Estate of Heiser v. Islamic Republic of Iran, 466 F.Supp.2d 229, 356 (D.D.C. 2006). The D.C. judgment was registered with the United States District Court for the District of Maryland on August 27, 2008, and with the United States District Court for the Southern District of New York on September 8, 2008. (Nevling Supp. Dec., Ex. 1, 2). The Heisers then obtained a modified judgment under 28 U.S.C. § 1605A on September 30, 2009, that increased their total recovery to $591,089,956. (Nevling Supp. Dec., Ex. 3.) The Heisers have not registered the modified judgment in Maryland or New York and have sought to enforce their original judgment.

On February 7, 2008, the D.C. District Court issued an order pursuant to 28 U.S.C. § 1610(c) permitting the Heiser Judgment Creditors to pursue attachment in aid of execution of the December 2006 judgment. On April 30, 2010, the Heisers obtained a writ of garnishment from the District Court for the District of Maryland and served this writ on the Bank of New York in

Maryland on May 3, 2010. (Nevling Supp. Dec., Ex. 4.) Bank of New York served the Heisers with a third-party complaint, and the Heisers filed their amended answer on July 6, 2010.

The Bank of New York contends that the Heiser's writ is invalid, because the Heisers' right to enforce their judgment is governed by the law of New York State. According to the Bank of New York, New York law applies the separate entity rule, which, in this case, would require the Heisers to serve Bank of New York in New York, rather than in Maryland. The Heisers respond that the Blocked EFTs are intangibles with a situs in the United States, and that therefore the Heisers may pursue attachment in any jurisdiction in which the Bank of New York is subject to jurisdiction. The Heisers also contend that the attachment proceeding is governed by Maryland law, and not New York law as the banks assert.

1. Choice of Law

In order to determine whether the Heisers' service of writs of garnishment on the Bank of New York in Maryland was valid, the Court must first determine what law governs this dispute. This analysis hinges on whether the issue is procedural or substantive. The dispute between the Heisers and the Bank of New York regards whether the Heisers' Maryland-issued writs of execution reach blocked wire transfers that, the Bank of New York asserts, contain funds currently held in accounts located in New York, managed by employees who are based in New York. (Hall Dec. ¶ 3, Ex. A.) This issue therefore involves questions of attachment procedure; whether a writ of execution issued and served in one state can reach assets held in another state.

"The FSIA states that when a foreign state is not protected by sovereign immunity, 'the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances.' 28 U.S.C. § 1606. In attachment actions involving foreign states, federal courts thus apply Fed. R. Civ. P. 69(a), which requires the application of local state

procedures." Karaha Bodas Co., LLC, v. Persusahaan Pertambangan Minyak Dan Gas Bumi Negara, 313 F.3d 70, 83 (2d Cir. 2002). See Alliance Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A., 190 F.3d 16, 20 (2d Cir.1999) (applying Rule 69(a), and hence New York law, in an FSIA action). Federal Rule of Civil Procedure 69(a) states, in pertinent part:

> A money judgment is enforced by a writ of execution, unless the court directs otherwise. The procedure on execution — and in proceedings supplementary to and in aid of judgment or execution — must accord with the procedure of the state where the court is located, but a federal statute governs to the extent it applies.

Fed. R. Civ. P. 69(a).

Thus, "Rule 69(a) provides that in the absence of an applicable federal statute the procedure in supplementary proceedings to execute a federal court's judgment shall be that of the forum state." Resolution Trust Corp. v. Ruggiero, 994 F.2d 1221, 1226 (7th Cir. 1993).

The Heisers contend that the application of this rule results in Maryland law "govern[ing] the procedures for executing upon property of a judgment debtor for actions instituted out of the Maryland Court." (Heiser's Suppl. Mem. of Law at 6.) While the writ was issued by the U.S. District Court of Maryland, in this matter the Heisers are applying for a turnover order from this Court in the Southern District of New York. This proceeding is therefore a supplemental proceeding in aid of judgment or execution, and this Court is thus bound to apply the attachment procedures of the state where it is located; New York.

2. The Separate Entity Doctrine

Under New York law, "the separate entity rule dictates that each 'branch of a bank be treated as a separate entity for attachment purposes.'" Allied Maritime, Inc. v. Descatrade, S.A., 620 F.3d 70, 74 (2d Cir. 2010) (quoting Bergenske Dampskibsselskab v. Sabre Shipping Corp.,

341 F.2d 50, 53 (2d Cir. 1965)). This means that "the mere fact that a bank may have a branch within [a state] is insufficient to render accounts outside of [that state] subject to attachment." Allied Maritime, 620 F.3d at 74. (quoting John Wiley & Sons, Inc., v. Kirtsaeng, No. 08 Civ. 7834, 2009 WL 3003242 at *3 (S.D.N.Y. Sept. 15, 2009).

Following this doctrine, service of a writ of attachment on the Bank of New York's Maryland branch is not sufficient to attach assets residing in accounts in New York State. Bank of New York has demonstrated that the Blocked Assets the Heisers seek are maintained in accounts located in New York, managed by employees who are based in New York. (Hall Dec. ¶ 3, Ex. A.) Therefore, the Heisers cannot demonstrate their entitlement to a turnover order issuing from this court on the basis of their Maryland writ of attachment, and their motion for such order is denied.

F. The Greenbaum and Acosta Writs

As discussed, the writs of execution served on the New York Banks by the Levins and the Heisers are invalid for the reasons stated. The Greenbaum and Acosta creditors served writs of execution on Citibank and JP Morgan in New York, after having obtained a court order in this District pursuant to 28 U.S.C. 1610(c) permitting them to proceed with their executions. (Greenbaum and Acosta Mem. in Opp. at 8.) The only other group that has attached and executed against the Phase One Assets are the Rubin judgment creditors, who, like the Levins, have not obtained court order under 28 U.S.C. 1610(c). In addition, the Rubins did not perfect their levy within 90 days of service.

Therefore, the Greenbaum and Acosta creditors hold a priority interest in the Phase One Assets held at Citibank and JP Morgan.

III. Attachment of the Phase One Assets Held at Citibank and JP Morgan

In order to determine whether a turnover order can be issued as to the assets held at Citibank and JP Morgan that are sought by the Greenbaum and Acosta judgment creditors, the Court must first determine whether these assets are subject to attachment.

The Citibank and JP Morgan Phase One Assets include accounts and electronic fund transfers ("EFTs") that have been frozen by the Office of Foreign Asset Control ("OFAC"). In this case, the assets were blocked by OFAC due to an apparent nexus with the Islamic Republic of Iran, or an agency or instrumentality of the Iranian government. (See Smith Decl., Ex. 2.) Iran is the subject of numerous sanctions and blocking programs. 31 C.F.R. Parts 535, 544, 560, 594-597; See also Bank of New York v. Rubin, 484 F.3d 149; In re Republic of Iran Terrorism Litigation, 659 F.Supp. 2d 31, 36 n.1 (D. D.C. 2009).

Pursuant to the International Emergency Economic Powers Act (50 U.S.C. § 1701, 1702), various Presidents have issued Executive Orders for the purpose of blocking transactions with Iran.[4] Pursuant to these Executive Orders, OFAC administers several sanctions schemes regulating the assets of terrorists and state sponsors of terrorism, as well as assets linked to proliferators of weapons of mass destruction ("WMD") and their supporters. (Compl. at ¶ 36.) Such entities are designated by OFAC and placed on OFAC's list of "Specially Designated Nationals" ("SDNs") (Compl. at ¶ 37.) SDNs are defined as "individuals and entities which are owned or controlled by, or acting for or on behalf of, the governments of target countries or are

[4] These Orders include: Executive Order No. 12947, 60 Fed. Reg. 5079 (January 23, 1995) (Prohibiting Transactions with Terrorists Who Threaten to Disrupt the Middle East Peace Process); Executive Order No. 13099, 63 Fed. Reg. 45167 (August 20, 1998) (amending Exec. Order 12947); Executive Order 13224, 66 Fed. Reg. 49079 (September 23, 2001) (Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism). (Compl. at ¶ 33.) On June 28, 2005, the President also issued Executive Order No. 13382, 70 Fed. Reg. 38567, (Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters). (Compl. at ¶ 34.)

associated with international…terrorism." See United States Treasury Website, http://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.

Rule 69 of the Federal Rules of Civil Procedure designates state law procedure for the enforcement of a judgment as the appropriate procedure, subject to any governing law. Fed. R. Civ. P. 69. The Greenbaum and Acosta Judgment Creditors therefore seek turnover orders pursuant to New York Civil Practice Law and Rules ("CPLR") § 5225(b). CPLR § 5225(b) states:

> Upon a special proceeding commenced by the judgment creditor, against a person in possession or custody of money or other personal property in which the judgment debtor has an interest, or against a person who is a transferee of money or other personal property from the judgment debtor, where it is shown that the judgment debtor is entitled to the possession of such property or that the judgment creditor's rights to the property are superior to those of the transferee, the court shall require such person to pay the money, or so much of it as is sufficient to satisfy the judgment, to the judgment creditor, and if the amount to be so paid is insufficient to satisfy the judgment, to deliver any other personal property, or so much of it as is of sufficient value to satisfy the judgment, to a designated sheriff.

CPLR § 5225(b).

In order to issue a turnover order in favor of the Greenbaums and Acostas as to the Citibank and JP Morgan Phase One Assets, this Court must first determine that the assets are subject to attachment under governing law, and that the record establishes the Greenbaum and Acosta Judgment Creditors' entitlement to a turnover order under § 5225(b). Due to the Second Circuit precedent specifically addressing the attachment of electronic fund transfers ("EFTs"), see Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd., 585 F.3d 58 (2d Cir. 2009); Export-Import Bank of the U.S. v. Asia Pulp & Paper Co., Ltd., 609 F.3d 111 (2d Cir. 2010), this opinion will first address the intercepted EFTs, and then discuss the Citibank deposit accounts.

A. The Wire Transfers

The Phase One Assets held at Citibank and JP Morgan primarily consist of the proceeds of blocked EFTs currently held in interest bearing accounts, as required by law. (Smith Decl., Exs. 8-12.). Citibank holds the proceeds of one EFT in the amount of [redacted] associated with the [redacted] (Smith Decl., Ex. 12) JP Morgan holds the proceeds one EFT in the amount of [redacted] associated with [redacted]. (Id.)

In their joint response Memorandum of Law and at oral argument, Citibank and JP Morgan suggest that under the applicable Second Circuit precedent and state law, these intercepted EFTs are not the property of the originator or the beneficiary, and therefore are not susceptible to attachment. (Citibank and JP Morgan's Joint Response Mem. of L. at 15-17.)

Two recent Second Circuit decisions, Shipping Corp. of India Ltd. v. Jaldhi Overseas Pte Ltd., 585 F.3d 58 (2d Cir. 2009), cert. denied, 130 S. Ct. 1896 (2010) ("Jaldhi") and Asia Pulp & Paper Co., Ltd., 609 F.3d 111 (2d Cir. 2010) ("Asia Pulp"), address the issue of whether EFTs residing at intermediary banks in the United States can be attached.

Jaldhi involved the attachment of property under Rule B of the Admiralty Rules. In that case, the Court found that in order to attach EFTs under Rule B, the attachment must be of "tangible or intangible property" that is "the defendant's." Jaldhi, 585 F.3d at 66. In order to determine whether the property interest held by the defendant was adequate to render the property "the defendant's," as required by Rule B, the Court looked to state law, concluding that because "there is no federal maritime law to guide our decision, we generally look to state law to determine property rights." Id. at 70. The Court applied New York's U.C.C. Article 4 to

[5] Citibank also holds three inactive deposit accounts: (1) an account containing [redacted] in the name of [redacted], (2) an account containing [redacted] held in the name of [redacted], and (3) an account containing [redacted] in the name [redacted].

determine whether EFTs can be considered the defendant's property. Id. The Court found that New York state law does not permit the attachment of EFTs that are in the possession of an intermediary bank. Id. The Court further found that under New York law, "a beneficiary has no property interest in an EFT because 'until until the funds transfer is completed by acceptance by the beneficiary's bank of a payment order for the benefit of the beneficiary, the beneficiary has no property interest in the funds transfer which the beneficiary's creditor can reach.'" Id. at 71 (quoting N.Y. U.C.C. § 4-A-502 cmt. 4.) The Court concluded that "[b]ecause EFTs in the temporary possession of an intermediary bank are not property of either the originator or the beneficiary under New York law, they cannot be subject to attachment under Rule B." Id.

Asia Pulp addressed the issue of whether an EFT in the possession of an intermediary bank could be garnished under the Federal Debt Collection Procedures Act ("FDCPA") to satisfy judgment debts owed by either the originator or beneficiary. 609 F.3d at 114-115. The Court in Asia Pulp found that "Jaldhi instructs that whether or not midstream EFTs may be attached or seized depends upon the nature and wording of the statute pursuant to which attachment or seizure is sought." Id. at 116. The Asia Pulp court then went on to examine the FDCPA, and found that the statute authorized the "issuance of writs of garnishment to any person 'in possession, custody or control' of property 'in which the debtor has a substantial nonexempt interest.'" Id. The Court then proceeded in a two-step inquiry; first, looking to state law to see what interest the debtor has in the property that the debt collector seeks to reach, and second, looking to federal law, namely the FDCPA, to see if these interests are "substantial interests" such that would allow garnishment. Id. at 118. In the first step of the analysis, the Court reached the same conclusion as the Jaldhi court, and found that under New York state law, mid-stream EFTs are neither the property of the originator or the beneficiary. Id. at 120.

Judge Marrero of this District recently issued a decision addressing the attachment of EFTs in the context of TRIA. Hausler v. JP Morgan Chase Bank, N.A., No. 09 Civ. 10289, 2010 WL 3817546 (Sept. 13, 2010). The Court in Hausler found that TRIA and the underlying federal sanctions regulations (the Cuban Asset Control Regulations, or "CACRs"), considered together, preempted state property law, and therefore the Court did not apply N.Y. U.C.C. Article 4 as had the Courts in Jaldhi and Asia Pulp. Id. at *4-*12. The Hausler Court found that TRIA, in conjunction with the CACRs, preempt state law because TRIA explicitly defines "blocked asset" as "any asset seized or frozen by the United States under [§ 5(b)] of the [Trading With the Enemy Act ("TWEA")] or under sections 202 and 203 of the [International Emergency Economic Powers Act]." TRIA § 201(d)(2). The Hausler court concluded that because the CACRs were enacted under § 5(b) of TWEA they should be considered in tandem with TRIA to determine whether the wire transfers were attachable. Id. at *6. In considering both together, the Court concluded that federal law comprehensively addressed property rights in this context, and therefore preempted state law:

> For decades prior to the passage of TRIA, OFAC regulations have routinely included both property and interests in property among the assets authorized to be blocked. See, e.g., 31 C.F.R. § 575.201 (Iraq); 31 C.F.R. § 535.201 (Iran); 31 C.F.R. § 537.201 (Burma). Therefore, when drafting TRIA, Congress was presumably aware of the types of assets blocked under OFAC regulations...As noted above, TRIA § 201(d)(2) defines "blocked assets" to include all assets blocked under the CACRs, and without further direction from Congress excepting interests in property from the blocked assets subject to execution, the Court is not persuaded that the word "of" equates to actual ownership or title and thus would operate to so limit the blocked assets subject to turnover proceedings.

Id. at *7.

The Court in Hausler found further support for its position in the Supreme Court's decision in Ministry of Defense and Support for the Armed Forces of the Islamic Republic of

Iran v. Elahi, 129 S. Ct. 1732, 1739 (2009). In Elahi, the Court was considering whether an arbitral judgment awarded to Iran constituted a "blocked asset" subject to execution under TRIA. In making its ruling in Elahi, "the Court considered whether Iran had an 'interest in the property' as required by the relevant OFAC regulations." Hausler, 2010 WL 3817546 at *8. Similarly, in Asia Pulp, the Second Circuit held that "Jaldhi instructs that whether or not midstream EFTs may be attached or seized depends upon the nature and wording of the statute pursuant to which attachment or seizure is sought." Asia Pulp, 609 F.3d 111 at 116.

In this case, Plaintiffs are seeking attachment or seizure pursuant to TRIA and 28 U.S.C. § 1610(f)(1)(A).

TRIA states that:

> Notwithstanding any other provision of law...in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a).

TRIA defines "terrorist party" to mean "a terrorist, a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi))), or a foreign state designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371)." TRIA § 201(d)(4). Iran was designated as a state sponsor of terrorism under the Export Administration Act of 1979, and therefore is a terrorist party within the meaning of TRIA. See 49 Fed. Reg.

2836-02 (Jan. 23, 1984) (notice of Secretary of State George P. Schulz, designating Iran as a state sponsor of terrorism).

TRIA then goes on to define blocked assets as, in pertinent part, "(A) any asset seized or frozen by the United States under section 5(b) of the Trading With the Enemy Act (50 U.S.C. App. 5(b)) or under sections 202 or 203 of the International Emergency Powers Act (50 U.S.C. 1701; 1702)."

The language of TRIA is broad, subjecting *any asset* to execution that is seized or frozen pursuant to the applicable sanctions schemes. The breadth of this language is unsurprising in light of TRIA's remedial purpose. Hausler, 2010 WL 3817546 at *9. Senator Tom Harkin, a sponsor of the Act, stated the following prior to the law's passage:

> The purpose of [TRIA] is to deal *comprehensively* with the problem of enforcement of judgments issued to victims of terrorism is any U.S. court by enabling them to satisfy such judgments from the frozen assets of terrorist parties. As the conference committee stated, TRIA establishes, once and for all, that such judgments are to be enforced against any assets available in the U.S. and that the executive branch has no statutory authority to defeat such enforcement under standard judicial processes, except as expressly provided in this act.

148 Cong. Rec. S11528 (daily ed. Nov. 19, 2002) (emphasis added).

As Judge Marrero observed in Haulser, TRIA's definition of "blocked assets" defines which assets are subject to attachment by reference to the regulations pursuant to which the assets are blocked, and it is this definition that dictates what interest in property subjects a judgment debtor's property to attachment. Hausler, 2010 WL 3817546 at *5. Therefore, in order to determine whether the Phase One Assets held at Citibank and JP Morgan are subject to attachment, the regulations imposing the sanctions on Iranian assets must be considered.

Transactions involving Iranian assets are blocked pursuant to a series of regulations, including 31 C.F.R. § 535, 544, 560, 594-597. 31 C.F.R. § 544, underlies the scheme governing Weapons of Mass Destruction ("WMD") Proliferators Sanctions, and serves to effectuate Executive Order 13382, which freezes assets of proliferators.[6]

Under 31 C.F.R. § 544.201, "all property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of U.S. persons, including their overseas branches, of the following persons are blocked." The regulation then goes on to explain that any entity engaged in the proliferation of weapons of mass destruction is included in the list of "persons" whose property interests are blocked. Section 544.305 defines an "interest in property," as referred to in section 544.201, as "an interest of any nature whatsoever, direct or indirect." Id.

Another sanctions scheme blocking Iranian assets is the series of Terrorism Sanctions Regulations found at 31 C.F.R. 595. These regulations block transactions "in property or interests in property of specially designated terrorist[s]." 31 C.F.R. 595.201. The regulation then defines what constitutes an interest in property identically to the non-proliferation sanctions; "an interest of any nature whatsoever, direct or indirect." 31 C.F.R. 595.307.

Thus, pursuant to either the proliferation or terrorist sanctions scheme, any interest in property, of any nature, whatsoever, direct or indirect, held by any of the Iranian entities linked to the Phase One assets, is blocked. This definition of what constitutes a "property interest" is substantially broader than that found under New York law, and evinces a congressional intent to block even property in which a terrorist entity has only a limited interest. Unlike Maritime Rule

[6] Several of the entities linked to the Phase One Assets, namely [redacted], have been designated as WMD proliferators. See Office of Foreign Asset Control, Overview of Non-Proliferation Sanctions, available at http://www.treasury.gov/resource-center/sanctions/Programs/Documents/iran.pdf.

B in Jaldhi, or the FDCPA in Asia Pulp, here federal law is not silent on what interest in property would subject the assets to attachment. The property interest required for a terrorist party's assets to be blocked under these schemes is "any interest of any nature whatsoever." Accordingly, the Court finds that TRIA and the applicable sanctions regulations "establish a comprehensive statutory scheme that eschews any need for consideration of state definitions of property." Hausler, 2010 WL 3817546 at *6. Therefore, the Jaldhi rule regarding EFTs does not apply.

Moreover, section 1610(f)(1)(A) of the FSIA contains language very similar to that of TRIA, and provides further indications that Congress intended for all blocked assets in which terrorist entities have an interest to be available for attachment by plaintiffs holding valid judgments. Section 1610(f)(1)(A) states:

> Notwithstanding any other provision of law...any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701-1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or 1605A.

28 U.S.C. § 1610(f)(1)(A)

Even if the blocked EFTs were not subject to attachment under TRIA, they are included in the category of assets section 1610(f)(1)(A) subjects to attachment. The statute states that "any property" with respect to which transactions are prohibited, or even regulated, is subject to execution or attachment in aid of execution of judgments against state sponsors of terror. 28 U.S.C. § 1610(f)(1)(A). All of the Phase One Assets constitute property with respect to which

financial transactions are prohibited. Unlike TRIA, there is no "of the terrorist party" language in section 1610(f)(1)(A), clarifying Congress's intent to make blocked assets, regardless of whether they are owned in entirety by terrorist parties, available to victims of terrorism.

It is plainly the intention of TRIA and the FSIA to make blocked assets available to plaintiffs. As Asia Pulp states, "whether or not midstream EFTs may be attached or seized depends upon the nature and wording of the statute pursuant to which attachment or seizure is sought." Asia Pulp, 609 F.3d 111 at 116. The nature and wording of TRIA and FSIA section 1610(f)(1)(A) indicate that Congress intended all blocked assets be available for attachment by victims of terror. This Court concurs with the Hausler Court that in drafting TRIA and 1610(f)(1)(A), Congress was aware of the types of assets that are blocked under the applicable regulations, and therefore understood that by wording the statutes so broadly, it was subjecting all such assets to execution. If Congress had wished to exclude EFTs from the variety of assets subject to attachment, it could have done so. Instead, TRIA and the FSIA employ language subjecting *any* blocked assets to attachment in these circumstances.

Based on this Court's reading of TRIA, section 1610(f)(1)(A) and the applicable sanctions regulations, the Phase One blocked EFTs held at Citibank and JP Morgan are subject to attachment.

While these blocked assets are susceptible to attachment, the Greenbaum and Acosta motion for turnover must comply with N.Y. CPLR § 5225(b), as required by Fed. R. Civ. P. 69. If the evidence presented is sufficient to demonstrate that the entities whose assets have been blocked are agencies and instrumentalities of Iran, and are entitled to the possession of these funds, but for the blocked nature of the accounts, these assets may be used to satisfy judgments. See Weininger v. Castro, 462 F.Supp.2d 457, 499 (S.D.N.Y. 2006).

The banks and the Iranian entities served with process have provided no evidence to indicate that any of the Iranian entities owning or with interests in the assets held at Citibank and JP Morgan are not agencies or instrumentalities of the Iranian government, and this issue does not appear to be in dispute. It is the movant's burden on summary judgment, nevertheless, to demonstrate that there is no issue of material fact as to the availability of these assets for turnover. Rodriguez v. City of New York, 72 F.3d 1060-61 (2d Cir. 1995). Therefore, the evidence offered to support relationship between Iran and the entities whose assets are sought is summarized briefly below.

The Greenbaums and Accostas largely rely on the facts as stated by the Levin Plaintiffs regarding the Iranian interest in these assets. (Greenbaum/Acosta 56.1 Statement at ¶ 10.) The Levins, in turn, rely heavily on an affidavit presented by Dr. Patrick Clawson, a Deputy Director for Research of the Washington Institute for Near East Policy. See Affidavit of Dr. Patrick Clawson, February 24, 2010, Levin v. Bank of New York et.al, 09 Civ. 5900, ECF # 233 ("Clawon Aff."). Dr. Clawson has extensive experience researching and consulting with government officials about Iran, and has published several books on the subject.

The first asset, held at JP Morgan, is a blocked EFT sent for the benefit of [REDACTED] [REDACTED] in the amount of [REDACTED] (Smith Decl., Ex. 12, 10.) According to Dr. Clawson, [REDACTED] is wholly owned by the Islamic Republic of Iran, and is controlled by Iran. (Clawson Aff at ¶ 27.) In support of this contention, Dr. Clawson cites several online sources, including the [REDACTED] website, which indicates that the [REDACTED], owned

by the Islamic Republic of Iran, is the sole owner of [redacted] (Id., See also [redacted]

The second asset is a blocked EFT held at Citibank, sent for the benefit of the [redacted] in the amount of [redacted]. Dr. Clawson states that it is common knowledge that the National Iranian Oil Company is wholly owned by the Islamic Republic of Iran, and that the [redacted] was established by the National Oil Company of Iran. (Clawson Aff., ¶ 27.) Dr. Clawson also states that the [redacted] is controlled by Iran. (Id.) It has not been disputed that the [redacted] is an agency or instrumentality of Iran.

B. The Citibank Accounts

Three of the assets currently held by Citibank are funds from inactive correspondent accounts associated with certain Iranian banks. (Smith Decl., Ex. 11 p. 5.) These assets include [redacted] at an account associated with [redacted]; [redacted] in account associated with [redacted]; and [redacted] in an account associated with [redacted]. As discussed earlier, TRIA and the FSIA render any blocked asset linked to a terrorist party subject to execution or attachment in order to satisfy judgments held by terrorist victims.

Under CPLR § 5225, Plaintiffs are entitled to a turnover order of the assets held in these accounts if Citibank is a "person in possession or custody of money" in which agencies or instrumentalities of Iran have an interest. Weininger v. Castro, 462 F.Supp.2d 457, 499 (S.D.N.Y. 2006). If the evidence presented is sufficient to demonstrate that three entities linked to this account are agencies and instrumentalities of Iran, and are entitled to the possession of

[7] The Iranian ownership of [redacted] is further confirmed by a press release from the U.S. State Department. Fact Sheet, Treasury Announces Targets on Iran's Nuclear and Missile Programs, U.S. Treasury Department (June 17, 2010), available at http://www.state.gov/t/isn/143265.htm.

these funds, but for the blocked nature of the accounts, these assets may be used to satisfy judgments. Id. at 499.

Citibank, in its brief jointly submitted with JP Morgan, explains that

> "[t]he Defendant banks make no independent assessment of the terrorist status of an account holder or wire transfer party that is subject to blocking pursuant to these regulations. Rather, they simply block (1) any account in their possession where the designated name appears, and (2) any wire transfer when the designated name appear in the string of parties to the wire transfer."

There is no dispute that these three Citibank accounts are, indeed, blocked accounts subject to TRIA. Therefore, these assets are subject to attachment under TRIA, and can be turned over so long as Plaintiffs have satisfied the procedural requirements of CPLR § 5225 and demonstrated that Iran, the judgment debtor, or agencies and instrumentalities of Iran, have an interest in these assets.

The first account is held in the name of ██████ ██. Dr. Clawson states that ███ ██████ is "wholly owned by the Islamic Republic of Iran," and a national bank of Iran. (Clawson Aff. at ¶ 21.) In support of this assertion, Dr. Clawson cites a Treasury Department Press Release ████ ████ ██████████████████████ ███ ████ ██████ ██████████████ ████████ among other sources. (Clawson Aff. at ¶ 21.) Dr. Clawson also includes a link to the Central Bank of Iran website, which lists ██████ as government-owned bank ██ ████████████████████ Moreover, ██████ conceded that it is an agency or instrumentality of Iran in the ██████ case. ████████████████████████████████████████

The second account is held in the name of ███████. According to Dr. Clawson ████ ███████ is a wholly owned subsidiary of the Islamic Republic of Iran. (Clawson Aff. at ¶ 22.) "State-owned central banks indisputably are included in the § 1603(b) definition of "agency

or instrumentality." Weininger, 462 F.Supp. 2d at 498. In support of this finding, Dr. Clawson cites the OFAC-SDN List, as well as a Treasury Department Press Release [redacted] available at https://ustreas.gov/press/releases/hp219.htm). (Clawson Aff. at ¶ 22.)

The third account is held in the name of [redacted] Dr. Clawson states that it is common knowledge and is his expert opinion that [redacted] is wholly owned by the Islamic Republic of Iran. (Clawson Aff. at ¶ 23.) In support of this statement, Dr. Clawson cites the OFAC-SDN list as well as several Iranian sources. [redacted] has been specifically designated in Executive Order 13882 in October 2007 as a supporter of the proliferation of Weapons of Mass Destruction on behalf of the government of Iran.

In light of this Court's finding that TRIA subjects all of these Blocked Assets to attachment, and that the record demonstrates that the judgment creditor, Iran, or its agencies or instrumentalities have an interest in these assets, the deposit accounts held in the names of [redacted] at Citibank are subject to attachment.

It has been demonstrated that there is no triable issue of fact as to the Greenbaum and Acosta Judgment Creditors' entitlement to turnover of the Phase One Assets held at Citibank and JP Morgan, they are awarded such judgment as a matter of law. Citibank and JP Morgan are ordered to turnover the above identified assets of [redacted] to the Greenbaum and Acosta creditors in partial satisfaction of their judgment, and are hereby released from claims as to those assets asserted by other parties.

## CONCLUSION

Due to their failure to obtain a court order under 28 U.S.C. § 1610(c) prior to serving the writs of execution on the New York Banks, the Levins writs are invalid.  In addition, the Heisers' writ is not capable of attaching the Bank of New York assets located in New York state because it was issued by a Maryland court and served on the Bank of New York in Maryland.  The Greenbaum and Acosta Judgment Creditors have established that there is no issue of material fact that they hold a priority interest in those Phase One Assets which they have attached at Citibank and JP Morgan, and those assets are subject to attachment.  The Greenbaum and Acosta Judgment Creditors are entitled as a matter of law to a grant of partial summary judgment as to those assets.

## PARTIAL FINAL JUDGMENT

The Court having determined that there are good grounds for entering a partial judgment immediately, this Opinion and Order constitutes a partial final judgment, within the meaning of Rule 54(b) of the Federal Rules of Civil Procedure, and there is no just reason for delay in the entry of judgment as provided herein.  This Opinion and Order presents a controlling question of law which has not previously been decided, namely, the question of whether the requirements of 28 U.S.C. § 1610(c) are applicable to this proceeding.  Entry of such partial final judgment will permit the Levin Plaintiffs, who are in their 80s and (in the case of Jeremy Levin) in ill health, to take an immediate appeal.   Immediate appeal of this partial judgment will assist in the prompt adjudication of claims brought by the Levin Plaintiffs, the Greenbaum and Acosta Judgment Creditors, the Heiser Judgment Creditors, among others, to additional blocked assets during Phase Two of the case.  An immediate appeal might also provide guidance with regard to the

adjudication of other turnover cases, which may involve similar issues, pending before other judges in this District but which have not progressed as far as this action.

Notwithstanding the foregoing, this partial judgment shall constitute a final judgment only with respect to the validity of the Levins' claims to the Phase One Assets (identified in Exhibit 12 to the Smith Declaration, which is filed under seal), the validity of the Greenbaum and Acosta Judgment Creditors' claims to the Citibank Phase One Assets and the JP Morgan Phase One Asset, and with respect to the claims of any party to or the rights of any party in the Citibank Phase One Assets or the JP Morgan Phase One Asset.

This judgment, compliance with its terms, and all proceedings to enforce it, shall be stayed pending appeal by the Levin Plaintiffs from the judgment being entered hereby to the United States Court of Appeals for the Second Circuit, on the condition that a notice of appeal is filed in a timely fashion. In view of the Levins' intent to appeal solely on this issue of law, any actions by any parties to this litigation with regard to the Phase One Assets are also stayed pending appeal by the Levin Plaintiffs.

IT IS SO ORDERED.

Dated: New York, New York
March 4, 2011

Robert P. Patterson, Jr.

U.S.D.J.

Copies of this opinion were sent to:

| | |
|---|---|
| Suzelle Smith<br>Howarth & Smith<br>523 West Sixth Street, Suite 728<br>Los Angeles, CA 90017<br>Fax:  213-622-0791<br>(via fax and ECF) | Robert Joseph Tolchin, Esq.<br>225 Broadway, 24th Floor<br>New York, NY 10007<br>Fax: (212) 227-5090<br>(via fax and ECF) |
| Howard B. Levi<br>J. Kelley Nevling, Jr.<br>Levi Lubarsky & Feigenbaum LLP<br>1185 Avenue of the Americas, 17th Floor<br>New York, NY 10036<br>Fax:  212-308-8830 | Annie Pennock Kaplan<br>Fay Kaplan Law, P.A.<br>700 Fifth Street NW<br>Wasshington, DC 20001<br>Fax: (202)-589-1721<br>(via fax and ECF) |
| Sharon L. Schneier<br>Davis Wright Tremaine LLP<br>1633 Broadway<br>New York, NY 10019<br>Fax: 212-489-8340<br>(via fax and ECF) | Liviu Vogel<br>Petek Gunay<br>Salon Marrow Dyckman Newman Broudy LLP<br>292 Madison Ave, 6th floor<br>New York, NY 10017<br>Fax: (212) 661-3339<br>(via fax and ECF) |
| Mark G. Hanchet<br>Christopher J. Houpt<br>Mayer Brown LLP<br>1675 Broadway<br>New York, NY 10019<br>Fax:  212-849-5695<br>(via fax and ECF) | Cary Brian Samowitz<br>DLA Piper US LLP (NY)<br>1251 Avenue of the Americas<br>New York , NY 10020<br>Fax: (212) 335-4501<br>(via fax and ECF) |
| Curtis Campbell Mechling<br>Jeremy Sage Rosof<br>Stroock & Stroock & Lavan LLP<br>180 Maiden Lane<br>New York, NY 10038<br>Fax: 212-806-2609<br>(via fax and ECF) | Dale K. Cathell<br>David B. Misler<br>Richard M. Kremen<br>DLA Piper US LLP (MD)<br>6225 Smith Avenue<br>Baltimore, MD 21209<br>Fax: (410)-580-3122<br>(via fax and ECF) |
| Jeffrey Lance Nagel<br>Terry Alan Myers<br>Gibbons P.C. (NY)<br>One Pennsylvania Plaza, 37th Floor<br>New York , NY 10119<br>Fax: (973)-639-6265<br>(via fax and ECF) | George Michael Chalos<br>Kerri Marie D'Ambrosio<br>Chalos & Co., P.C.<br>123 South Street<br>Oyster Bay , NY 11771<br>Fax: (866) 702-4577<br>(via fax and ECF) |
| Noel J. Nudelman<br>Fax: (202)-463-2999<br>(via fax and ECF) | All additional counsel of record<br>(via ECF) |