# EXHIBIT B

160654

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
JAY GLENN,

                       Plaintiff,                    10-cv-8287 (WHP)

    -against-

THOMAS FORTUNE FAY, STEVEN R. PERLES        AMENDED
and FAY & PERLES,                                        COMPLAINT

                       Defendants.
-----------------------------------------------------------------x

        Plaintiff Jay Glenn ("Glenn"), by his attorneys Daniel Cobrinik and Ian Blant, hereby commences this civil action against Defendants Thomas Fortune Fay ("Fay"), Steven R. Perles, Esq., ("Perles") and Fay & Perles ("F&P") to enforce his attorney's charging lien against any assets collected in New York by Defendants. In support of his action, Plaintiff Glenn alleges as follows:

**DIVERSITY JURISDICTION**

        1.    Glenn is a resident of the State of Illinois, with his residence address at 27148 West Lakeview Drive South, Lake Barrington, Illinois 60084.

        2.    Glenn is an attorney admitted to practice in the State of Illinois.

        3.    Defendant Fay is a resident of Silver Spring, Maryland, with his residence address located at 2048 Merrifields Drive, Silver Springs, Maryland 20906.

        4.    Upon information and belief, defendant Perles is a resident of Florida, but maintains his business address at 1146 19th Street, N.W., 5th Floor, Washington, D.C. 20036.

        5.    On information and belief, defendant F&P is a partnership with its place of business located at 777 6th Street N.W., Suite 410, Washington, D.C. 20001.

1

6. The amount in controversy in this case exceeds Seventy Five Thousand Dollars ($75,000.00).

7. There is complete diversity of citizenship between the parties.

8. This Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**IN REM JURISDICTION**

9. As set forth in detail below, Glenn prosecuted claims on behalf of 103 plaintiffs arising from the 1983 bombing in Beirut, Lebanon (the "Beirut Bombing") in a lawsuit in the United States District Court for the District of Columbia (the "Peterson Litigation"), and referred other family members to Defendants.

10. The Peterson Litigation resulted in a $2,656,944,877.00 judgment in favor of the plaintiffs (the "Peterson Plaintiffs") and against the Islamic Republic of Iran ("Iran").

11. On information and belief, Defendants have located assets belonging to Iran in New York (the "New York Assets"), including assets held in New York by Citibank N.A., ("Citibank") and by Clearstream Bank S.A. ("Clearstream"), and a building located at 650 Fifth Avenue, New York, New York.

12. On information and belief, Defendants retained New York lawyers to institute collection proceedings to recover the New York Assets for the benefit of the Peterson Plaintiffs.

13. On information and belief, Defendants brought the aforementioned collection actions in the United States District Court for the Southern District of New York because this is the judicial district where the New York Assets are located, and because this Court has jurisdiction over the New York Assets.

14. By virtue of his work on the Peterson Litigation, Glenn has a charging lien against the Peterson Plaintiffs' judgment and against any proceeds of such judgment, which charging lien will attach to the New York Assets if and when those assets are recovered by the Peterson Plaintiffs.

15. On information and belief, a turnover order which would direct that the New York Assets be used to satisfy the Peterson Plaintiffs' judgment against Iran is likely to be issued within a short time period.

16. Upon issuance of such a turnover order, the attorneys who worked on the Peterson Litigation – including Glenn -- would have a lien against part of the New York Assets.

17. Pursuant to 28 U.S.C. § 1655, this Court has *in rem* jurisdiction to determine claims to property which is located in New York, including the New York Assets.

18. This Court has such *in rem* jurisdiction to determine claims to New York property even where the competing claimants to such assets would not be otherwise subject to *in personam* jurisdiction in New York.

19. This Court has *in rem* jurisdiction to determine the amount of Glenn's charging lien against the New York Assets, pursuant to 28 U.S.C. § 1655.

**IN PERSONAM JURISDICTION**

20. On information and belief, Defendants are each doing business in New York on a regular, continuous and substantial basis.

21. Defendants retained New York law firms to represent the Peterson Plaintiffs in at least three collection actions in New York.

22. Defendants hired New York attorneys as their agents to prosecute at least three turnover actions (the Turnover Actions") involving billions of dollars of New York assets in this Court: i.e., *Peterson v. Islamic Republic of Iran*, 08 MIS 302, *Levin v. Islamic Republic of Iran* and *Peterson v. 650 Fifth Avenue Holding Company*, 10-cv-1627.

23. The Turnover Actions are likely to result in hundreds of millions of dollars in New York Assets being paid to Defendants.

24. On information and belief, Defendants' agents -- the New York attorneys retained by Defendants – have made dozens of court appearances and filed many many papers in the State of New York, all in an effort to collect a judgment in the State of New York which will likely enrich Defendants to the tune of several hundred million dollars.

25. Defendants are purposefully availing themselves of the benefit of New York's laws to collect a judgment against Iran, while simultaneously attempting to circumvent Glenn's charging lien against the New York Assets which are the proceeds of this judgment.

26. The Court's personal jurisdiction over Defendants does not offend due process where Defendants are continuously and substantially benefitting from the laws of New York in an effort to collect billions of dollars in New York Assets for their clients and themselves.

27. Pursuant to the foregoing, this Court has personal jurisdiction over Defendants under New York CPLR § 301.

28. Moreover, this Court also has personal jurisdiction over Defendants under New York's long arm statute, CPLR § 302.

**PARTIES**

29. Glenn is an attorney admitted to practice law in the State of Illinois and engaged in

the practice of law in Illinois.

30. Defendant Fay is an attorney admitted to practice law in the District of Columbia, and engaged in the practice of law in the District of Columbia.

31. Defendant Steven R. Perles is an attorney admitted to practice law in the District of Columbia, and is engaged in the practice of law in the District of Columbia.

32. Defendant F&P is a partnership engaged in the practice of law in the District of Columbia.

33. On information and belief, Defendants Fay and Perles are the only partners in F&P and exercise complete control over F&P.

34. Based on the foregoing, Fay and Perles are liable for all obligations of F&P to Glenn, as set forth below.

## THE 1983 BEIRUT MARINE CORPS BOMBING LITIGATION

35. In 1983 terrorists attacked the United States military barracks in Beirut, Lebanon, killing 241 American servicemen including 220 United States Marines, and causing many other persons to suffer horrific injuries (the "Beirut Bombing").

36. Numerous legal actions (the "Beirut Bombing Actions") were commenced against the government of Iran ("Iran") on behalf of the estates of the marines who were killed, the surviving marines and the widows, children, parents and siblings of marines who were killed in the Beirut Bombing.

37. The aforementioned actions were brought under the state sponsored terrorism exception to the Foreign Sovereign Immunities Act.

38. The Beirut Bombing Actions alleged that Iran masterminded the Beirut Bombing,

5

and sought damages from Iran.

39. Starting in or about 2001 Defendant F&P was retained by certain relatives of the Beirut Bombing victims to prosecute their claims (the "F&P Plaintiffs") against Iran in the Beirut Bombing Actions.

40. On or about October 2, 2001, F&P filed Case No. 1:2001-cv-02094 entitled Peterson, et al. v. Islamic Republic of Iran, in the United States District Court for the District of Columbia, and on December 28, 2001 F&P filed a second case entitled Boulos, et al. v. Islamic Republic of Iran, (collectively referred to herein as the "Peterson Actions") on behalf of those victims of the Beirut Bombing who had retained F&P.

## THE AGREEMENTS BETWEEN GLENN AND DEFENDANTS

### The Legal Services Fee Agreement

41. Defendants' retainer agreements with their clients in the Peterson Action provided that F&P was to receive a contingent legal fee equal to Thirty Three and One Third Percent (33 1/3%) of any recovery for those plaintiffs.

42. In or about 2001, Defendants retained Glenn to help with prosecution of the Peterson Action.

43. Defendants asked Glenn to try the damages phase of the Peterson Action for 63 of the Peterson Plaintiffs before a special master.

44. Because Glenn was not admitted to the bar of the District of Columbia, F&P moved for his admission pro hac vice in open court, so that Glenn could try the damages portion of the Peterson Action.

45. Glenn has known the Fay family for 50 years, and Fay has been Glenn's brother-in-

law since 1967.

46. In light of this long family relationship, Glenn trusted Fay implicitly.

47. On information and belief, Defendants did not want to pay any of the attorneys who worked with them on the Peterson Action on an hourly basis, because they did not have any money coming in from the case. All of the attorneys who worked with defendants on the Peterson Action – including Glenn -- agreed to payment on a contingency basis.

48. In June, 2003, Defendants offered to pay Glenn Three Percent (3%) of any damages which he proved and which were recovered on behalf of the plaintiffs in the Peterson Action (the "Legal Services Fees").

49. Glenn accepted Defendants' offer.

50. On or about June 13, 2003, Glenn signed an undated contract (the "Legal Services Contract"), which provided in pertinent part that Glenn would receive Three Percent (3%) of any ultimate recovery of damages which he proved in the Peterson Litigation.

51. Defendants delivered a fully executed copy of the Legal Services Contract to Glenn four years later, on or about June 23, 2007, thereby acknowledging in writing their agreement that Glenn would have a right to payment equal to Three Percent (3%) of any damages which (1) he proved and (2) were subsequently recovered on behalf of plaintiffs in the Peterson Action.

**The Legal Referral Fees Agreement**

52. After starting work on the Peterson Action, Glenn realized that defendants had failed to identify all the potential plaintiffs who they should have joined in the Peterson Action.

53. Glenn located Forty (40) additional plaintiffs with claims against Iran (the "Glenn Plaintiffs").

7

54. Glenn offered to identify such additional potential clients for Defendants in exchange for the standard contingency referral fee, equal to one third of F&P's one third contingency fee, or 11.1111% of any judgment actually recovered for the Glenn Plaintiffs.

55. Beginning in or about 2003 and continuing to March, 2010, Fay told Glenn numerous times that Glenn was entitled to a standard referral fee equal to Thirty Three and One Third (33 1/3%) of any legal fee F&P earned for each such Plaintiff that Glenn referred to F&P (the "Legal Referral Fees").

56. In reliance on this promise and subsequent correspondence with his brother-in-law Fay, Glenn referred Forty (40) plaintiffs to F&P.

57. All of these Glenn Plaintiffs were joined in the Peterson Action, and became F&P Plaintiffs as a result of Glenn's work.

58. Glenn submitted the Special Master recommendations to Fay and F&P and each transmittal specified the Special Master's recommendation and projected Fees, both the Damage Attorney Award and Referral Fees.

## THE HISTORY OF THE PETERSON ACTION

59. In March 2003, The U.S. District Court for the District of Columbia conducted a trial to determine the liability of Iran in the Peterson Action, and the amount of the damages to be awarded to the families of the victims of the Beirut Bombing.

60. Glenn was instrumental in proving the damages suffered by 103 of the plaintiffs in the Peterson Action.

61. As a result of Glenn's work, and the work of other attorneys, the court issued a judgment holding Iran liable to the plaintiffs in the Peterson Action for compensatory damages totaling $2,656,944,877.00.

62. Due to Defendants' failure to follow Glenn's advice, no punitive damages were awarded in the Peterson Case.

63. The judgment in the Peterson Case is now final and non-appealable.

**THE SUBSEQUENT PETERSON COLLECTION ACTIONS**

64. On information and belief, in 2008, Defendants retained attorneys to bring numerous collection actions against Iran (the "Peterson Collection Actions").

65. On information and belief, at least two Peterson Collection Actions are now pending in the Southern District of New York, and the Peterson Plaintiffs have been joined as necessary parties in a third proceeding in this District.

66. On information and belief, the Peterson Collection Actions sought to satisfy the judgment in the Peterson Action from Iran's secret bank accounts in the Southern District of New York, including Citibank N.A. and Clearstream Bank S.A.

67. On information and belief, as a result of the Peterson Collection Actions, more than Two Billion Dollars ($2,000,000,000.00) in assets located in New York but belonging to Iran have been frozen to pay damages to the Peterson Action plaintiffs, and to pay attorneys' fees for the attorneys in the Peterson Action.

68. On information and belief, these payments will begin shortly.

69. On information and belief, the Defendants have a charging lien on any recovery in New York which lien will likely result in Defendants' recovery of several hundred million dollars in legal fees for their representation of Peterson Plaintiffs.

**DEFENDANTS' DISPUTE OF GLENN'S CHARGING LIEN**

70. Defendants have communicated to Glenn that they do not recognize his charging lien in the Peterson Litigation and that they will not honor his charging lien.

71. Defendants have told Glenn in substance that he is not entitled to payment of the Legal Referral Fees which he earned by locating and referring the 40 Glenn Plaintiffs.

72. Defendants never paid Glenn any money for proving approximately $309,741,881.00 in 103 damage claims in the Peterson Action.

73. Glenn has a charging lien for his Legal Services Fees in the amount of Three Percent (3%) of any recovery by these Peterson Plaintiffs

74. If the entire judgment is recovered, Glenn's charging lien against the New York Assets for his Legal Services Fees would be $9,292,256.43, plus three percent (3%) of any interest award.

75. The Forty (40) Peterson Plaintiffs that Glenn referred to Defendants have been awarded a combined judgment of $111,750,000.00.

76. Glenn has a charging lien for his Legal Referral Fees in the amount of 11.1111% of any recovery by the Glenn Plaintiffs.

77. If the entire judgment is recovered, Glenn's charging lien against the New York Assets for his Legal Referral Fees would be approximately $12,416,666.66 plus 11.1111% of any interest recovered by the Glenn Plaintiffs.

78. Glenn also has a charging lien in the amount of $15,288.56 for reimbursement of out of pocket expenses that he paid in connection with his representation of the Peterson Plaintiffs, including identification and referral of the Glenn Plaintiffs, and his proof of damages on behalf of Peterson Plaintiffs.

79. As a result of the foregoing there is a justiciable controversy over the existence and amount of Glenn's charging lien against the New York Assets.

## COUNT 1

80. Plaintiff repeats and realleges each allegation set forth in paragraphs 1 through 79 as though set forth more fully herein.

81. By virtue of the foregoing, Glenn is entitled to a declaratory judgment affirming that he has a charging lien against any recovery in the Peterson Collection Actions in New York in an amount equal to 3% of any recovery by the 103 Peterson Plaintiffs who he represented in proving damages, and 11.1111% of any recovery for the Forty (40) Glenn Plaintiffs.

82. By virtue of the foregoing, Glenn has a charging lien against the New York Assets if and when a final turnover order issues directing that those assets be paid to the Peterson Plaintiffs.

## COUNT 2

83. Plaintiff repeats and realleges each allegation set forth in paragraphs 1 through 82 as though set forth more fully herein.

84. On information and belief, as a result of the Peterson Collection Actions, funds located in New York have been identified and frozen.

85. On information and belief, Defendants and their agents are prosecuting a turnover proceeding in the Southern District of New York, to obtain the frozen Iranian assets and to use them to satisfy the judgment in the Peterson Action.

86. On information and belief, the turnover proceedings in New York are sealed.

87. Glenn is unable to obtain any information about the turnover proceeding in the Peterson Collection Actions from PACER.

88. Defendants have refused to provide Glenn with any information about the turnover proceeding.

89. As an attorney with an interest in receiving payment of legal fees, Glenn has a charging lien against any proceeds recovered as a result of the Peterson Collection Actions and the turnover proceeding now pending in the Southern District of New York.

90. Glenn has already signed all protective orders necessary to obtain access to sealed documents in the Peterson Litigation and will sign any additional protective orders and/or other agreements and/or documents necessary to obtain access to sealed documents in the Peterson Collection Actions.

91. Glenn's attorneys are also willing to sign any documents necessary to obtain access to sealed documents in the Peterson Collection Actions.

92. Glenn is also entitled to copies of all pleadings and proceedings in the turnover proceedings, so that he can protect his interest in those turnover proceedings.

**WHEREFORE,** Plaintiff prays that the Court enter a judgment:

a)  Declaring that Plaintiff has a valid and enforceable charging lien against any recovery of the New York Assets in the Peterson Collection Actions equal to 3% of any recovery

for the 103 Peterson Plaintiffs for whom Glenn proved damages, plus 11.1111% of any recovery for the Forty (40) Glenn Plaintiffs who were referred to Defendants by Glenn.

    b)    Directing that Plaintiff and his counsel be permitted access to the sealed files in the Peterson Collection Actions so that Plaintiff may protect his charging lien; and

    c)    Awarding to Glenn such other relief as the Court deems just and proper.

Dated: New York, New York
       December 2, 2010

                               Daniel Cobrinik (DC 6406)
                               Attorney for Plaintiff
475 Park Avenue South – 19th Floor
New York, New York 10016
(212) 725-6888