UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JEREMY LEVIN AND DR. LUCILLE
LEVIN,

               Plaintiffs,

    v.

BANK OF NEW YORK, JPMORGAN
CHASE, SOCIÉTÉ GÉNÉRALE SA, and
CITIBANK,

            Defendants.

Civ. No. 09 CV 5900 (RPP) (MHD)

**DECLARATION OF
PROFESSOR JIMMY GURULÉ**

IN SUPPORT OF CONSOLIDATED
REPLY IN FURTHER SUPPORT OF
JUDGMENT CREDITORS' JOINT
MOTION FOR PARTIAL SUMMARY
JUDGMENT ON CLAIMS FOR
TURNOVER OF PHASE TWO
BLCOKED ASSETS

## DECLARATION OF PROFESSOR JIMMY GURULÉ

I, Professor Jimmy Gurulé, being duly sworn, depose and say:

1.     I have been retained by plaintiffs in *Levin v. Bank of New York, et al.*, No. 09cv5900 (S.D.N.Y. June 26, 2009). I have been asked to submit a declaration addressing the U.S. economic sanctions programs against the Republic of Iran, a designated state sponsor of terrorism. More specifically, I have been asked to examine the relevant federal legislation, executive orders and Treasury Department regulations intended to prevent Iran from accessing the U.S. financial system to transfer funds to finance and support terrorist activities by Hamas, Hezbollah, and related terrorist groups. Further, I have been asked to examine how allowing the victims of terrorism with civil judgments against state sponsors of terrorism to collect on blocked assets provides a valuable supplement to the U.S. Government's efforts to deprive terrorists of funding in order to prevent future terrorist attacks and save innocent civilian lives.

## I.
## Expert Qualifications

2.     I have extensive knowledge and experience in anti-money laundering and counter-terrorist financing, including U.S. economic sanctions against state sponsors of terrorism. As Under Secretary (Enforcement), U.S. Department of the Treasury, from 2001-2003, I had oversight responsibility for several major federal law enforcement agencies, including the U.S. Secret Service, U.S. Customs Service, Bureau of Alcohol, Tobacco and Firearms, Executive Office of Asset Forfeiture, Financial Crimes Enforcement Network (FinCEN), and the Office of Foreign Assets Control (OFAC). The U.S. Customs Service (now known as Immigration and Customs Enforcement or ICE) conducts complex money laundering

investigations. FinCEN is the federal agency responsible for enforcing the Bank Secrecy Act (31 U.S.C. §§5311 et seq.), and OFAC administers and enforces economic sanctions against, among others, state sponsors of terrorism and those individuals engaged in financing or providing material support to terrorists. As explained below, OFAC has authority to designate individuals and entities as Specially Designated Global Terrorists (SDGTs) and to place their names on the Treasury Department list of Specially Designated Nationals (SDNs).

3.       As Under Secretary of the Treasury, I played a central role in developing and implementing the U.S. Government's counter-terrorist financing strategy. Among other things, I was responsible for drafting the 2001 and 2002 National Money Laundering Strategy (NMLS). The NMLS is intended to prioritize, focus, and coordinate the U.S. Government's resources used to combat money laundering and terrorist financing. Several federal agencies, bureaus and offices are involved in the development and implementation of the NMLS, including: the U.S. Department of the Treasury; U.S. Department of Justice; U.S. Department of State; Federal Bureau of Investigation; Drug Enforcement Administration; Federal Deposit Insurance Corporation; Federal Reserve Board; FinCEN; OFAC; Internal Revenue Service; Office of the Comptroller of the Currency; Office of Thrift Supervision; Immigration and Custom Enforcement; U.S. Postal Inspection Service; U.S. Secret Service; Office of National Drug Control Policy; U.S. Securities and Exchange Commission; and the Treasury Department Executive Office of Asset Forfeiture. Further, while serving as Under Secretary, I supervised the promulgation of Treasury Department regulations implementing the anti-money laundering and counter-terrorist financing provisions of the USA PATRIOT Act (P.L. 107-56, 115 Stat. 272 (2001).

4.      The Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub.L. No. 107-297, 116 Stat. 2322, was passed by Congress and signed into law by President Bush while I was Under Secretary.  I am very familiar with the implementation of TRIA, OFAC regulations defining blocked assets and their application to TRIA, the use of blocked assets in payment of judgments of Americans who are victims of state sponsors of terrorism and entities who engage in prohibited commercial transactions using United States financial institutions, and the way the overall enforcement program supports the United States goal of fighting terrorism by cutting off possible funding mechanisms to designated terrorist entities.

5.      As an expert in money laundering and terrorist financing, I have given lectures at conferences, universities, before international bankers associations, and other venues located domestically and abroad, including: Siracusa, Italy (2012) (International Institute of Higher Studies in Criminal Sciences); Las Vegas, Nevada (2010) (Association of Certified Anti-Money Laundering Specialists); Tirana, Albania (2008); London, England (2008) (Chatham House); Mumbai, New Delhi, Calcutta, and Puna, India (India Bankers Association, among other venues) (2006), Milan, Rome and Naples, Italy (2005) (Guardia de Finanza, National Anti-Mafia Agency, Carabinieri, Banca Intesa, Italian Bankers Association, CEISS B Military Center for Strategic Studies; Catholic University, Research Center on TransCrime, Milan, Italy); Economic Forum Series, U.S. Embassy, Brussels, Belgium (2005); Amerika Haus, Vienna, Austria (2004, 2005); Austrian Defense Academy, Vienna, Austria (2005); Asuncion, Paraguay (Catholic University School of Law, Comandancia de la Policia Nacional, SEPRELAD, Senators of Finance Committee) (2005); Raiffeisenlandesbank, Linz, Austria (2004); International Organization of Securities Commissions (IOSCO), New York City (2004); World Economic Forum, Davos, Switzerland (2003); Euroforum, Madrid, Spain (2003); Conference on Money

Laundering and Financial Crimes, Central Banking Publications Ltd., Windsor, England (2003);

Institute of International Bankers, New York City (2003); Florida International Bankers

Association, Miami, Florida (2003); Heritage Foundation (2002); McGeorge School of Law

(2003); S.J. Quinney School of Law, University of Utah (2003); Columbus School of Law,

Catholic University, Washington, D.C. (2002).

6.      I also have served as an expert witness or expert consultant in over twelve multi-

million dollar money laundering and terrorist financing cases.

7.      I am currently a tenured member of the law faculty at Notre Dame Law School,

located in South Bend, Indiana, where I teach courses in Criminal Law, White Collar Crime,

International Criminal Law, and the Law of Terrorism.  As a law professor since 1989, I have

taught courses, conducted research, published scholarly articles, and lectured domestically and

internationally on the subject of money laundering and terrorist financing.

8.      I am the author and co-author of numerous books, law review articles, and other

publications on money laundering and terrorist financing, including: PRINCIPLES OF

COUNTERTERRORISM LAW (West Publ. 2011) (co-authored with Prof. Geoffrey Corn);

UNFUNDING TERROR: THE LEGAL RESPONSE TO THE FINANCING OF GLOBAL

TERRORISM (Edward Elgar 2008); INTERNATIONAL CRIMINAL LAW: CASES AND

MATERIALS (Carolina Academic Press 3d ed., 2007) (co-authored with Jordan Paust, Cherif

Bassiouni, Michael Scharf, Leila Sadat and Bruce Zagaris); THE LAW OF ASSET

FORFEITURE (LexisNexis 2d ed., 2004) (co-authored with Sandra Guerra Thompson and

Michael O''Hear); COMPLEX CRIMINAL LITIGATION: PROSECUTING DRUG

ENTERPRISES AND ORGANIZED CRIME (LEXIS 2d ed., 2001); HOW TO COMBAT

MONEY LAUNDERING AND TERRORIST FINANCING (Chapter 13) (Central Banking Publ.

Ltd. 2005); *The Demise of the U.N. Economic Sanctions Regime to Deprive Terrorists of Funding,* 41 CASE W. RES. J. INT"L L. 19 (2009); *Does "Proceeds" Really Mean "Net Profits"?: The Supreme Court's Efforts to Diminish the Utility of the Federal Money Laundering Statute,* 7 AVE MARIA L. REV. 339 (2009); *Who Is Winning the War on Terrorist Financing?,* THE FINANCIAL REGULATOR 25 (2005); *The Global Efforts to Stop Terrorist Financing,* AM. INT"L ELECT. J., U.S. DEP"T OF STATE (Aug. 2003); and *The Money Laundering Control Act of 1986: Creating a New Federal Offense or Merely Affording Federal Prosecutors an Alternative Means of Punishing Specified Unlawful Activity?,* 32 AM.CRIM.L.REV.823 (1996). Also, I am currently working on a new publication on NATIONAL SECURITY LAW (Aspen Publ., forthcoming 2013) (co-authored with Professors Geoffrey S. Corn and Eric T. Jensen).

      9.     As Under Secretary of Treasury, I testified before the following Congressional committees: Senate Judiciary Committee (11/20/02); House Committee on Ways and Means (6/26/02); U.S. Commission on Security and Cooperation in Europe (OSCE) (5/8/02); Senate Appropriations Subcommittee on Treasury and General Government (4/17-18/02); House Appropriations Subcommittee on Treasury, Postal Service and General Government (3/06/02, 2/27-28/02); Senate Select Committee on Intelligence (2/04/02); House Committee on Financial Services (10/03/01); Senate Committee on Banking, Housing, and Urban Affairs (9/26/01); House Permanent Select Committee on Intelligence (9/18/01); and Senate Committee on Finance (5/16/01). I have also addressed the United Nations Security Council 1267 and 1373 Sanctions Committee on freezing terrorist assets (Feb. and Sept. 2002).

      10.    In preparing my Declaration, I have reviewed the following documents:

     (A)     Complaint in *Levin v. Islamic Republic of Iran, et al.*, Case No. 05cv02494 (D.C. December 30, 2005);

     (B)     Levin Judgment (February 6, 2008);

(C)     Complaint in *Levin v. Bank of New York,* S.D.N.Y. Case No. 09 CV 5900 (S.D.N.Y. Jun. 26, 2009);

(D)     Levin Notice of Motion and Motion for Partial Summary Judgment (July 13, 2010);

(E)     Levin Memorandum of Law ISO Motion For Partial Summary Judgment (July 13, 2010);

(F)     Citibank and JPMorgan Memorandum of Law In Opposition to Levin Motion for Partial Summary Judgment (September 13, 2010);

(G)     Heisers, et al. Memorandum of Law In Opposition to Levin Motion for Partial Summary Judgment (September 13, 2010);

(H)     Greenbaum and Acosta Memorandum of Law In Opposition to Levin Motion for Partial Summary Judgment (September 13, 2010);

(I)     Levin Memorandum of Law in Reply to Greenbaum & Acosta Opposition to Motion for Partial Summary Judgment (September 27, 2010);

(J)     Response to Levin Motion for Partial Summary Judgment (September 27, 2010);

(K)     Levin Memorandum of Law in Reply to Heiser, et al. Opposition to Motion For Partial Summary Judgment (September 27, 2010);

(L)     Opinion & Order Re Motion For Partial Summary Judgment (January 20, 2011);

(M)     Order Granting the Levins-Greenbaum-Acosta and Heiser Joint Motion For Summary Judgment (June 30, 2011);

(N)     Corrected Order Granting the Levin-Greenbaum-Acosta and Heiser Joint Motion For Summary Judgment (July 11, 2011);

(O)     Judgment Creditors Notice of Motion and Joint Motion For Partial Summary Judgment;

(P)     Judgment Creditors Memorandum of Law In Support of Joint Motion for Partial Summary Judgment;

(Q)     Judgment Creditors 56.1 Separate Statement;

(R)     JPMorgan Response to Judgment Creditors 56.1 Separate Statement;

(S)     Bank of New York Mellon Response to Judgment Creditors 56.1 Separate Statement;

(T)     Societe Generale Response to Judgment Creditors Joint Motion For Partial Summary Judgment;

(U)     Third Party Response to Judgment Creditors Joint Motion For Partial Summary Judgment (filed under seal);

(V)     Third Party Response to Judgment Creditors 56.1 Statement (filed under seal);

(W)     JPMorgan and Bank of New York Mellon Memorandum of Law in Response to Judgment Creditors Motion for Partial summary Judgment; and

(X)     Citibank Response to Judgment Creditors Motion For Partial Summary Judgment.

## II.
## Iranian Sanctions and Pertinent Law

11.     For over thirty years, Iran has posed a threat to the national security, foreign

policy and economy of the United States.  In response, the United States has imposed a number

of economic sanctions against Iran pursuant to the International Emergency Economic Powers

Act (IEEPA), 50 U.S.C. §§ 17012- 1701.  Enacted in 1977, IEEPA authorizes the President to

impose economic sanctions on a foreign country that poses "any unusual and extraordinary threat

. . . to the national security, foreign policy, or economy of the United States, if the President

declares a national emergency with respect to such threat."[1] Upon declaration of a national

emergency, the IEEPA authorizes the President to --

> investigate, block during the pendency of an investigation, regulate . . .
> prevent or prohibit, any acquisition, holding, withholding, use, transfer,
> withdrawal . . . dealing in, or exercising any right, power, or privilege with
> respect to, or transactions involving, any property in which any foreign
> country or a national thereof has any interest by any person, or with
> respect to any property, subject to the jurisdiction of the United States.[2]

IEEPA makes it unlawful for any person "to violate, attempt to violate, conspire to

violate, or cause a violation of any license, order, regulation, or prohibition issued under

[IEEPA]."[3]  Violators may be subject to civil or criminal penalties.  Civil sanctions may not

exceed $250,000.[4]  However, a person who "willfully" violates IEEPA shall, upon conviction, be

fined not more than $1,000,000, or imprisoned for not more than 20 years, or both.[5]

---

[1] 50 U.S.C. § 1701(a).
[2] *Id.* § 1702(a)(1)(B).
[3] *Id.* § 1705(a).
[4] *Id.* §1505(b).
[5] *Id.* §1505(c).

12.    On November 14, 1979, President Jimmy Carter issued the first executive order declaring a national emergency against Iran in response to the Iran hostage crisis. Executive Order 12170 authorized freezing all Iranian assets held within the United States.

13.    Since 1970 there have been numerous executive orders issued under IEEPA to strengthen economic sanctions against Iran. In 1987, President Reagan issued Executive Order 12613, which imposed a broad ban on all imports of goods and services originating from Iran. President Reagan found that Iran was "actively supporting terrorism as an instrument of state policy." The principal objective of Executive Order 12613 was to "ensure that United States imports of Iranian goods and services will not contribute financial support to terrorism." [6]

14.    A series of economic sanctions followed in 1995 and 1997 strengthening existing sanctions against Iran. On March 15, 1995 President Clinton issued Executive Order 12957, which prohibited certain transactions with respect to the development of Iranian petroleum resources.[7] Less than two years later, on May 6, 1995, President Clinton issued Executive Order 12959, which strengthened existing prohibitions and imposed comprehensive trade and financial sanctions on Iran. The sanctions prohibited both exportation and importation of any goods or services between the U.S. and Iran. More specifically, Executive Order 12959 prohibited "the exportation from the United States to Iran, the Government of Iran, or to any entity owned or controlled by the Government of Iran, or the financing of such exportation, of any goods, technology . . . or services."[8]

---

[6] Prohibiting Imports from Iran, Exec. Order No. 12613, 52 FR 41940 (Oct. 30, 1987).
[7] *See* Prohibiting Certain Transactions with Respect to the Development of Iranian Petroleum Resources, Exec. Order No. 12957, 3 C.F.R. 14615 (March 15, 1995)
[8] Prohibiting Certain Transactions with Respect to Iran, Exec. Order No. 12959, 3 C.F.R. 24757 (May 6, 1995)

15.     On August 19, 1997, President Clinton issued Executive Order 13059, clarifying Executive Orders 12957 and 12959 and prohibiting virtually all trade and investment activities with Iran by U.S. persons.[9]

16.     In response to President Clinton's executive orders, the Secretary of the Treasury promulgated the Iranian Transaction Regulations (ITRs), 31 C.F.R. Part 560, which implement the sanctions imposed by the Executive Orders.  The ITRs prohibit "the exportation, re-exportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran."[10]  Specifically, "United States depository institutions are prohibited from performing services with respect to Iranian accounts."[11]  With the exception of a limited list of exempt transactions, the ITRs prohibit U.S. depository institutions from servicing Iranian accounts.[12]

17.     The U.S. Government has also imposed economic sanctions against Iran aimed at freezing the assets of proliferators of weapons of mass destruction and their supporters.[13]

### III.
### Terrorist Designations

18.     A central component of the U.S. Government's counter-terrorism strategy is to deprive terrorists and terrorist organizations such as al Qaeda, Hamas, and Hezbollah of funding. As I have previously written, "[m]oney is critical to financing terrorist operations (operational costs) as well as sustaining the organizational infrastructure of terrorist groups (organizational

---

[9] *See* Prohibiting Certain Transactions with Respect to Iran, Exec. Order No. 13059 (Aug. 19, 1997).

[10] 31 C.F.R. § 560.204.

[11] 31 C.F.R. § 560.517(a).

[12] *Id.*

[13] *See* Blocking Property of Weapons of Mass Destruction Proliferators and Their Supporters, Exec. Order No. 13,382 (2005).

costs.)."[14]  Terrorists "need money to finance their organizational activities, including paying

operatives, recruiting and training new members, bribing government officials, forging ties with

other [terrorist groups], paying travel and communications expenses, and acquiring weapons,

[and] explosives."[15]  Indeed, these concerns have been recognized by international standard-

setters and policy-making bodies.  For example, according to the Financial Action Task Force on

Money Laundering:

> [T]errorist organizations . . . require financial support in order to achieve
> their aims.  A successful terrorist group, like any criminal organization, is
> therefore necessarily one that is able to build and maintain an effective
> financial infrastructure.  From this it must develop sources of funding, a
> means of laundering those funds and then finally a way to ensure that the
> funds can be used to obtain material and other logistical items needed to
> commit terrorist acts.[16]

19.     Attacking the financial infrastructure of terrorist groups is fundamentally a

preventive strategy.  Starving terrorists of funding worldwide is critical to preventing terrorism.

Although the ultimate goal is to save lives by preventing the use of funds to fuel terrorist attacks,

going after the money is important for other reasons as well.  First, identifying terrorist financial

networks may expose terrorist financing money trails that may generate leads to previously

unknown terrorist cells and financiers.[17]  Second, investigating and disrupting channels of

funding may also force terrorists and their sympathizers to use more costly, less efficient and less

---

[14] JIMMY GURULÉ, UNFUNDING TERROR: THE LEGAL RESPONSE TO THE FINANCING OF GLOBAL TERRORISM, 21 (2008) [hereinafter UNFUNDING TERROR].

[15] *Id.*

[16] Financial Action Task Force on Money Laundering, Guidance for Financial Institutions in Detecting Terrorist Financing 3-4 (April 24, 2002).  The Financial Action Task Force (FATF) is an inter-governmental body that develops and promotes international standards and policies to combat money laundering and terrorist financing.  Key resources include the 40 Recommendations on Money Laundering and 9 Special Recommendations on Terrorist Financing.

[17] U.S. Dep't of Treasury, National Money Laundering Strategy 7 (2003), *available at* http://www.treasury.gov/offices/enforcement.publications/ml2003.pdf.

reliable means to transfer money globally to finance terrorist activities.[18]  Third, blocking the

assets of front companies, arresting terrorist financiers, and shutting down corrupt charities may

deter wealthy donors, financial institutions and others form providing financial assistance to

terrorist organizations.  Simply stated, depriving terrorists and terrorist organizations of funding

is as important as targeting the operational terror cells.

      20.     The centerpiece of the U.S. Government's counter-terrorist financing strategy is

the designation of terrorists and their sponsors as Specially Designated Terrorists (SDTs) or

Specially Designated Global Terrorists (SDGTs) and the freezing of their assets and prohibition

of dealings in property belonging to such individuals.[19]  The designation of foreign groups that

engage in acts of terrorism is also an important component of the strategy.  The Secretary of

State is authorized to designate foreign groups that engage in terrorist activities as "Foreign

Terrorist Organizations" (FTOs).[20]  Further, Congress has made it a federal crime to provide

"material support or resources" to an FTO.[21]

      21.     Further, the U.S. Department of State is authorized to designate countries as "state

sponsors of terrorism."  State sponsors of terrorism are determined by the Secretary of State to

provide critical support to terrorist groups, including financial assistance.  These States are

designated pursuant to three laws: section 6(j) of the Export Administration Assistance Act (50

App. U.S.C. § 2405); section 40 of the Arms Export Control Act (22 U.S.C. § 2780); and section

620A of the Foreign Assistance Act (22 U.S.C. § 2371).  Countries placed on the State

Department terrorism list are subject to four main sets of U.S. Government sanctions:

      (1) A ban on arms-related exports and sales.

---

[18] *Id.*
[19] UNFUNDING TERROR, *supra* note 14, at 194-97.
[20] *See* 8 U.S.C. § 1189.
[21] *See* 18 U.S.C. § 2339B.  *See also* 8 U.S.C. § 1189(a)(1), (d)(4).

(2) Controls over exports of dual-use items, requiring 30-day Congressional notification for goods or services that could significantly enhance the terror-list country's military capability or ability to support terrorism.

(3) Prohibitions on economic assistance.

(4) Imposition of miscellaneous financial and other restrictions.[22]

22.    Iran has been designated by the State Department (among other countries) as a state sponsor of terrorism.[23] The Iranian Ministry of Information and Security ("MOIS") and Iranian Revolutionary Guard Corps ("IRGC") are major institutions through which the Iranian government has provided financial, technical and material support for terrorism including acts of terrorism against the Levins and other American citizens.[24] As I have previously written, State sponsors of terrorism, including Iran, use a variety of sources to fund international terrorism. Iran is a major funding source for Hizballah . . . providing the terror group $100-200 million per year. Hizballah has been designated as a foreign terrorist organization by the U.S. State Department. It has been described as "an organization with capability and worldwide presence [that] is [al Qaeda's] equal, if not a far more capable organization." Iran provides funding, training, and weapons to Lebanese Hizballah and Palestinian terrorist groups such as Hamas, Palestinian Islamic Jihad (PIJ), the al-Aqsa Martyrs Brigade, and the Popular Front for the Liberation of Palestine-General Command (PFLP-GC).[25]

The IRGC and MOIS have been involved in planning and supporting terrorist attacks. In October 2007, the Treasury Department designated the IRGC-Qods, a branch of the IRGC, as a

---

[22] *See* 2005 Country Reports on Terrorism, Office of the Coordinator for Counterterrorism, U.S. Dep't of State (April 28, 2006), *available at* http://www.state.gov/s/ct/rls/crt/2005/64337.htm. The financial restrictions include "authority to prohibit any U.S. citizen from engaging in a financial transaction with a terror-list government without a Treasury Department license." *Id.*

[23] On January 19, 1984, Iran was designated a SST. *See* U.S. Dep't of State, State Sponsors of Terrorism, http://www.state.gov/j/ct/rls/crt/2011/195547.htm. *See also* 49 Fed. Reg. 2836-02.

[24] *See* Levin v. Islamic Republic of Iran, Report and Recommendations, Civ. No. 05-2494 (GK/JMF) (D.C. D.C. Dec. 31, 2007)

[25] UNFUNDING TERRORISM, *supra* note 14, at 105 (internal citations omitted).

specially designated global terrorist for providing material support, including financial assistance, to the Taliban, Hizballah, Hamas, PIJ and PFLP-GC.[26]

## A.      Specially Designated Global Terrorist

23.      Since the terrorist attacks of September 11, 2001, the U.S. Treasury Department has blocked the assets of over 550 individuals and entities determined to be acting for or on behalf of, sponsoring, providing support or services to, or otherwise associated with, suspected terrorists or terrorist organizations.[27]  On September 23, 2001 (when I was working at the Treasury Department as Under Secretary for Enforcement), the President declared a national emergency pursuant to IEEPA, and signed Executive Order 13224.[28]  This Executive Order was issued in response to the "grave acts of terrorism and threats of terrorism committed by foreign terrorists, including the terrorist attacks in New York, Pennsylvania, and the Pentagon committed on September 11, 2001 . . . and the continuing and immediate threat of further attacks on . . . the United States."[29]  Executive Order13224 specifically observes that "because of the pervasiveness and expansiveness of the financial foundation of foreign terrorists, financial sanctions may be appropriate for those foreign persons that support or otherwise associate with these foreign terrorists."[30]

---

[26] *Id.* at 105-106.

[27] *See* Office of Foreign Assets Control list of SDGTs, *available at* http://www.treasury.gov/resource-center/sanctions/programs/documents/terror.pdf.

[28] *See* Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism, Exec. Order No. 13,244, 66 Fed. Reg. 49,079 (Sept. 23, 2001), 31 C.F.R. 78690 (2001), *reprinted as amended in* 50 U.S.C. § 1701 note (Supp. IV 2004), as amended by Exec. Order No. 13,268, 67 Fed. Reg. 44-751 (July 2, 2002) and No. 13,372, 70 Fed. Reg. 8499 (Feb. 16, 2005) [hereinafter E.O. 13224].

[29] *Id.*

[30] *Id.*

24.     Pursuant to Executive Order 13224, the Secretary of the Treasury blocked the property and interests in property in the United States of twenty-seven individuals and groups identified in an Annex to E.O. 13224.[31]   The list included "core members of al Qaeda, affiliated terrorist groups, Islamic charities suspected of funding al Qaeda, and other businesses believed to be a front for al Qaeda."[32]   Any person or group whose property is blocked pursuant to E.O.13224 is known as a SDGT.

25.     Executive Order 13224 also authorizes the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, to designate and block the property or property interests of *other* foreign individuals and groups as SDGTs that are determined:

>  (a) to be owned or controlled by, or act for or on behalf of those persons listed in the Annex to the Order or persons determined to be subject to the Order;[33]
> (b) to assist in, sponsor, or provide financial, material, or technological support for, or financial or other services to or in support of, acts of terrorism or individuals or entities designated under the Order;[34] or
> (c) to be otherwise associated with designated individuals or entities under the Order.[35]

26.     E.O. 13224 also authorizes blocking all property and interests in property of foreign persons and entities determined by the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, "to have committed, or to pose a significant risk of committing, acts of terrorism that threaten the security of U.S. nationals or the national

---

[31] *Id.* at § 1(a).
[32] UNFUNDING TERROR, *supra* note 14, at 195.
[33] E.O. 13224, supra note 28, at § 1(c).
[34] *Id.* at § 1(d)(i).
[35] *Id.* at § (d)(ii).

security, foreign policy, or economy of the United States."[36]  Thus, the Secretary of State as well

as the Treasury Secretary may initiate designations and asset freeze under E.O. 13224.

27.     Although E.O. 13224 was initially directed at blocking the assets of members of

al Qaeda and the Taliban, it is much broader in coverage, authorizing blocking all property and

interests in property of *all* persons and groups who pose a threat of future terrorist attacks and

threaten the national security, foreign policy, and economy of the United States.  Thus, the

names on the Treasury list include not only individuals and entities related to al Qaeda and the

Taliban, but individuals and groups affiliated with HAMAS and other terrorist groups, as well as

Iranian entities suspected of financing terror.[37]  For example, the Treasury Department has

designated, pursuant to E.O. 13224, Iran's state owned Bank Saderat, including its branches and

subsidiaries.[38]  Bank Saderat allegedly transferred $50 million between 2001 and 2006 from the

Central Bank of Iran through the Bank's subsidiary in London to its branch in Beirut for the

benefit of Hizballah.[39]

---

[36] *Id.* at § 1(b).
[37] See Office of Foreign Assets Control list of SDGTs *available at*
http://www.treasury.gov/resourcecenter/
sanctions/programs/documents/terror.pdf. *See also* Press Release, U.S. Dep''t of Treasury,
Secretary O''Neill,
Statement on the Blocking of Hamas Financiers'' Assets, *available at*
http://www.treas.gov/press/releases/po837.htm
(Dec. 4, 2001) (designating the Holy Land Foundation for Relief and Development); Press
Release, U.S. Dep''t of
Treasury, U.S. Designates Five Charities Funding Hamas and Six Senior Hamas Leaders as
Terrorists,
http://www.treasury.gov/press/releases/js672.htm (Aug. 22, 2003) (designating Commite de
Bienfaisance et de
Secours aux Palestiniens, Association de Secours Palestinian, Interpal, Palestinian Association in
Austria, and
Sanabil Association for Relief and Development).
[38] *See* UNFUNDING TERROR, *supra* note 14, at 106.
[39] *Id.*

28.    One method Iranian banks use to finance terrorist activities is to ask other financial institutions to remove their names when processing financial transactions, such as electronic funds transfers, "allowing Iran's banks to remain undetected as they move money through the international financial system to pay for the Iranian regime's illicit terrorist-related activities," as well as the funding of their nuclear program.[40]  This is one form of money laundering.  A key goal of Iranian banks and other entities is to change Iranian or other currency into U.S. dollars.  However, any transfer of funds into the United States with directions to forward such funds to an Iranian entity on the SDN list is a violation of U.S. law.[41]  Any such financial transactions are required to be stopped by the U.S. financial institution involved and put into an interest bearing "blocked account."[42]

---

[40] *Id.* at 107.

[41] *See* 31 C.F.R. § 595.201 ("Prohibited transactions involving blocked property.  (a) Except as authorized by regulations, orders, directives, rulings, instructions, licenses, or otherwise, no property or interests in property of a specially designated terrorist, that are in the United States, that hereafter come within the United States, or that are or hereafter come with the possession or control of U.S. persons, including their overseas branches, may be transferred, paid, exported, withdrawn or otherwise dealt in.").

[42] *See* 31 C.F.R. § 595.203, which provides:

> (a)(1)Any person, including a U.S. financial institution, currently holding property subject to § 595.201which,, as of the effective date or the date of receipt if subsequent to the effective date, is not being held in an interest-bearing account, or otherwise invested in a manner authorized by the Office of Foreign Assets Control, shall transfer such property to, or hold such property or cause such property to be held in, an interest-bearing account or interest-bearing status in a U.S. financial institution . . . unless otherwise authorized or directed by the Office of Foreign Assets Control.
> (2) The requirement set forth in paragraph (a)(1) of this section shall apply to currency, bank deposits, accounts, obligations, and any other financial or economic resources or assets, and any proceeds resulting from the sale of tangible or intangible property.  If interest is credited to an account separate from that in which the interest-bearing asset is held, the name of the account party on both accounts must be the same and must clearly indicate the specially designated terrorist having an interest in the accounts.  If the account is held in the name of a

B.      **Implications of an SDGT Designation**

29.      A blocking action under E.O. 13224 has several important consequences. First, all property and interests in property of designated individuals and entities in the United States or that come within the possession or controls of U.S. persons (as that term is defined in the statute) are blocked.[43]  Financial institutions are required to freeze the funds of an SDGT held by the bank.  Second, any transaction or dealing by U.S. persons in property or interests in property blocked pursuant to the Order is prohibited.[44]  Third, any transaction by any U.S. person that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions of the Order is prohibited.[45]  Finally, severe civil and criminal penalties may be assessed for violations of E.O. 13224.[46]

30.      In addition, pursuant to 18 U.S.C. §2339B(a)(2), any financial institution in possession of any funds in which a foreign terrorist organization or its agents has an interest must block such funds and report on the funds to the Department of the Treasury, or face civil penalties.[47]

C.      **Foreign Terrorist Organizations**

31.      On April 24, 1996, the President signed into law the Antiterrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1247-1258 (AEDPA).  Among other things,

specially designated terrorist, the name of the account to which interest is credited must be the same.
(b) For purposes of this section, the term interest-bearing account means a blocked account in a U.S. financial institution earning interest at rates that are commercially reasonable for the amount of funds in the account.  Except as otherwise authorized, the funds may not be invested or held in instruments the maturity of which exceeds 90 days.

[43] E.O. 13224, *supra* note 28, at §1.
[44] *Id.* at § 2(a).
[45] *Id.* at §2(b).
[46] 31 C.F.R. § 594.701(a)(1) (2007).
[47] 18 U.S.C. § 2339B(a)(2).

the AEDPA authorizes the Secretary of State, in consultation with the Secretary of the Treasury and the Attorney General, to designate an entity as an FTO.[48]  The AEDPA also makes it a felony offense for any person to "provide [ ] material support or resources to a foreign terrorist organization, or attempt[ ] or conspire[ ] to do so . . . ."[49]  The prohibition is based on a Congressional finding that terrorist organizations "are so tainted by their criminal conduct that *any* contribution to such an organization facilitates that conduct."[50]

32.      Foreign Terrorist Organizations (FTOs) are foreign organizations designated by the U.S. Secretary of State in accordance with section 219 of the Immigration and Nationality Act (INA), as amended. The Secretary of State may designate a foreign organization as an FTO upon finding that (1) the organization is a foreign organization, (2) the organization engages in terrorist activity or retains the capability and intent to engage in terrorist activity, and (3) the terrorist activity threatens national security or the security of United States nationals.[51]  In making an FTO determination, the Secretary of State compiles an administrative record and issues findings based on this record.[52]  Although, the designation may often be based on classified information, findings often also reflect publicly available, open source information concerning an organization.[53]  Generally, the administrative record and findings will usually seek

---

[48] 8 U.S.C. § 1189(a)(1), (d)(4). *See also* JIMMY GURULÉ & GEOFFREY CORN, PRINCIPLES OF COUNTER-TERRORISM LAW 261-63 (West Publ. 2011) [hereinafter PRINCIPLES OF COUNTER-TERRORISM LAW].

[49] 18 U.S.C. § 2339B(a)(1).

[50] AEDPA, note following 18 U.S.C. § 2339B (Findings and Purpose) (emphasis added).

[51] 8 U.S.C. § 1189(a)(1)(A)-(C).

[52] *Id.* at § 1189(a)(3)(A).  The FTO designation may be based on "classified information" which is unavailable for review by the designated party.  *Id.* at § 1189(a)(3)(B).

[53] *See* http://www.state.gov/s/ct/rls/other/des/123085.htm ("Once a target is identified, S/CT prepares a detailed administrative record,' which is a compilation of information, typically

to document the following categories of information about the organization: a description of the

organization, including its terrorist goals; past attacks and other terrorist activities attributable to

the organization; estimated size; senior leadership; location and area of operation; and external

aid.  However, unlike the designation of individuals and entities as Specially Designated Global

Terrorists, an FTO designation is not the end result of an interagency recommendation process.

Furthermore, seven days before designating an organization as an FTO, the Secretary of State

must submit to key Congressional leaders and committee members a classified communication

detailing the Secretary's findings in support of the designation decision.[54]

33.     To date, the Secretary of State has designated 51 foreign groups as FTOs.[55]  FTO

designations are published in the Federal Register.[56]

## IV.
## Terrorist Risk Insurance Act

34.     In November, 2002, Congress enacted the Terrorism Risk Insurance Act (TRIA),

which provides that when persons, such as Mr. Jeremy Levin and Dr. Lucille Levin, the

Greenbaum and Acosta Judgment Creditors, and Heiser Judgment Creditors have obtained a

judgment against a terrorist party on a claim based on acts of terrorism, such as that entered by

the United States District Court for the District of Columbia in  *Levin et al. v. Islamic Republic of

Iran et al.* (Case No. 05-2494) (2007), *Steven M. Greenbaum, et al. v. Islamic Republic of Iran et

al.* (Case No. 02-2148 (RCL) ( D.D.C), *Acosta et al. v. Islamic Republic of Iran, et al.* Case No.

06-745 (RCL) (D.D.C.), *Heiser v. Iran* (Case No. 00-CV-2329 RCL), and *Campbell v. Iran*

---

including both classified and open source information, demonstrating that the statutory criteria
for designation has been satisfied.").
[54] 8 U.S.C. §1189(a)(2)(A)(i).
[55] *See* Foreign Terrorist Organizations, Office of the Coordinator for Counterterrorism, U.S.
Dep't of State, Sept. 28, 2012, *available at* http://www.state.gov/j/ct/rls/other/des/123085.htm.
[56] 8 U.S.C. § 1189(a)(2)(A)(ii).

(Case No. 01-CV-2104 RCL), the blocked assets of that terrorist party, including the blocked

assets of any agency or instrumentality of that terrorist party, shall be available for execution or

attachment in order to satisfy the judgment to the full extent of any compensatory damages

awarded.[57]

35.    TRIA defines blocked assets as "any asset seized or frozen by the United States

under section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)) or under sections

202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701; 1702)."[58]

OFAC regulations, including 31 CFR 501 through 31 CFR 598 (specifically Iranian assets, 31

C.F.R. § 535) which detail that  assets, accounts, wire transfers or other property are to be

blocked by U.S. financial institutions, are used by the Treasury Department as an important

method of preventing and combatting terrorist financing.   OFAC regulations provide, in relevant

part:

>    (a) All property and interests in property of the Government of Iran, including the
>    Central Bank of Iran, that are in the United States, that hereafter come within the
>    United States, or that are or hereafter come within the possession or control of any
>    United States person, including any foreign branch, are blocked and my not be
>    transferred, paid, exported, withdrawn, or otherwise dealt in.
>    (b)  All property and interests in property of any Iranian financial institution,
>    including the Central Bank of Iran, that are in the United States, that hereafter
>    come within the United States, or that are or hereafter come within the possession
>    or control of any United States person, including any foreign branch, are blocked
>    and may not be transferred, paid, exported, withdrawn, or otherwise dealt in.
>    (c) All property and interests in property that are in the United States, that
>    hereafter come within the United States, or that are or hereafter come within the
>    possession or control of any United States person, including any foreign branch,
>    of the following persons are blocked and may not be transferred, paid, exported,
>    withdrawn, or otherwise dealt in: any person determined by the Secretary of the
>    Treasury, in consultation with the Secretary of State, to be owned or controlled
>    by, or to have acted or purported to act for or on behalf of, directly or indirectly,

---

[57] *See* TRIA § 201(a), codified at 28 U.S.C § 1610.
[58] TRIA § 201(d), codified at 28 U.S.C. § 1610.

any person whose property and interests in property are blocked pursuant to paragraphs (a) through (c) of this section.[59]

36.    Terrorist financing involves efforts to access the U.S. financial system to process checks, electronic funds transfers, deposit and withdrawn funds from U.S. bank accounts and convert Iranian currency into U.S. dollars to fund terrorist activities.  OFAC regulations which are used to implement TRIA broadly define "property and property interests" subject to blocking:

> [T]he terms property and property interests include, but are not limited to, money, checks, drafts, bullion, bank deposits, savings accounts, debts, indebtedness, obligations, notes guarantees, debentures, stocks, bonds, coupons, any other financial instruments, bankers acceptances, mortgages, pledges, liens, or to the rights in the nature of security, warehouse receipts, bills of lading, trust receipts, bills of sale, any other evidence of title, ownership or indebtedness, letters of credit and any documents relating to any rights or obligations thereunder, powers of attorney, goods, wares, merchandise, chattels, stocks on hand, ships, goods on ships, real estate mortgages, deeds of trust, vendors' sales agreements, land contracts, leaseholds, ground rents, real estate and any other interest therein, options, negotiable instruments, trade acceptances, royalties, book accounts, accounts payable, judgments, patents, trademarks or copyrights, insurance policies, safe deposit boxes and their contents, annuities, pooling agreements, services of any nature whatsoever, contracts of any nature whatsoever, and any other property, real, personal, or mixed, tangible or intangible, or interest or interests therein, present, future, or contingent.[60]

37.    It is an important aspect of the United States economic sanctions regime against Iran to prevent the use of U.S. financial institutions to process commercial transactions with Iran or its agencies and instrumentalities, including the use of wire transfers to convert Iranian currency into U.S. dollars.  Blocked assets include money, stock, electronic funds transfers, wire transfers, rights to payments, accounts, letters of credit, and anything of value, authorized to be blocked by the International Economic Powers Act (50 U.S.C. 1701-2), the Trading with the

---

[59] 31 C.F.R. § 560.211.
[60] 31 C.F.R. § 560.325.

Enemy Act (50 U.S.C. App. 5(b), Section 620(a) of the Foreign Assistance Act of 1961 (22

U.S.C. 2370(a)), and various regulations and executive orders, including Executive Order No.

13,382, 70 Fed Reg. 38567 (June 28, 2005), whether the assets are actually located in an account

held by a U.S. bank or U.S. branch of a foreign bank account.[61]

38.    The Department of the Treasury and the Department of State have special

statutory responsibilities to assist judgment creditors such as those involved in the present cause

of action in collecting those judgments.  Federal regulations provide: "At the request of any party

in whose favor a judgment has been issued with respect to a claim for which the foreign state is

not immune under section 1605(a)(7) (as in effect before the enactment of section 1605A) or

section 1605A, the Secretary of the Treasury and the Secretary of State should make every effort

to fully, promptly, and effectively assist any judgment creditor or any court that has issued any

such judgment in identifying, locating, and executing against the property of that foreign state or

any agency or instrumentality of such state."[62]

39.    Ultimately, U.S. efforts to prevent deadly terrorist attacks and save innocent lives

are furthered by allowing American victims of terrorism to collect their judgments from frozen

or blocked assets in which a terrorist party has a property interest.[63]  To read TRIA narrowly and

require a 100% ownership interest in blocked assets before a victim of terrorism could collect its

judgment rather than to permit collection on blocked assets in which a state sponsor of terrorism

has an interest, would severely undermine the United States strategy to combat the financing of

terrorism.  When victims of terrorism secure judgments against state sponsors of terrorism and

---

[61] *See*, 31 C.F.R. § 535.203(f).

[62] 28 U.SC. §1610(f)(2)(A).

[63] *See* UNFUNDING TERROR, *supra* note 14, at 324 ("Private lawsuits brought by victims of
terrorism can have a deterrent effect against the donors, corrupt charities, front organizations,
financial institutions, and foreign states that provide financial support and services to terrorist
organizations.").

are allowed to collect their judgments against blocked assets, this deters the financing of

terrorism and the proliferation of weapons of mass destruction by Iran.  Money is fungible.

Therefore, parties involved in electronic funds transfers intended for the benefit of Iranian

controlled banks and entities are facilitating Iran's ability to finance terrorist activities.  It would

undermine U.S. counter-terrorism efforts to prohibit electronic funds transfers from attachment

for the satisfaction of TRIA-based judgments or to require a showing of 100% Iranian ownership

rather than a showing that the government of Iran has an interest in such funds, consistent with

OFAC's definition of "property and property interest."

      I declare under penalty of perjury that the foregoing is true and correct.


Dated:  November **1** , 2012

Professor Jimmy Gurulé